**Eugene D. GAGLIARDI, Jr., Plaintiff,**

v.

**TRIFOODS INTERNATIONAL, INC., et al., Nominal Defendant,**

**G.J. Hart, Frank A. Adams, Grotech Capital Group, Inc., Grotech Partners II, L.P., Grotech Partners III, L.P., Grotech Partners IIID, L.P., Grotech Partners IIIC, L.P., Don J. Casturo, Point Venture Associates, L.P., Point Venture Partners Pennsylvania, L.P., and Brian Fleming, Defendants.**

Civil Action No. 14725.

Court of Chancery of Delaware,
New Castle County.

Submitted: June 3, 1996.
Decided: July 19, 1996.*

---

* Under Delaware Supreme Court Rule 93(b)(ii) the Committee on Opinions approved a portion of the original opinion for publication. [Editor's Note: Counts I–III, V and VI were not approved for publication.]

James G. Wiles, Law Offices of James G. Wiles, New Castle, for Plaintiff.

R. Franklin Balotti, Daniel A. Dreisbach, and Luke E. Dembosky, of Richards, Layton & Finger, Wilmington, for Defendant G.J. Hart.

Collins J. Seitz, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, for All Defendants except G.J. Hart.

## OPINION

ALLEN, Chancellor.

Currently before the Court is a motion to dismiss a shareholders action against the directors of TriFoods International, Inc. and certain partnerships and individuals that own stock in TriFoods. In broadest terms the motion raises the question, what must a shareholder plead in order to state a derivative claim to recover corporate losses allegedly sustain by reason of "mismanagement" unaffected by directly conflicting financial interests?

Plaintiff, Eugene Gagliardi, is the founder of the TriFoods, Inc. and in 1990 he induced certain persons to invest in the company by buying its stock. In 1993 he was removed as Chairman of the board and his employment with the company terminated. He continues to own approximately 13% of the company's common stock. The business of the company has, according to the allegations of the complaint, deteriorated very badly since Mr. Gagliardi's ouster.

The suit asserts that defendants are liable to the corporation and to plaintiff individually on a host of theories, most importantly for mismanagement. The matter is before the Court on defendants' motion to dismiss the derivative aspects of the complaint for failure to show that the preconditions established by Rule 23.1 for litigation of a derivative suit have been satisfied in this instance and, with respect to any alleged direct or individual claims, to dismiss those allegations for failure to state a claim.

To structure discussion of the issues raised by this motion, I address each of the six counts of the amended complaint *seriatim*, ruling on the legal sufficiency under Rule 12(b)(6) or Rule 23.1 as the case may be, before turning to the next count of the complaint. For the reasons set forth below, I conclude that, with the exception of a single claim that survives when read sympathetically in the light of a recent Supreme Court precedent (*see* Count II *infra* respecting

breach of employment contract), the amended complaint is subject to dismissal at this time. To a very limited extent, as indicated below, I will permit the filing of a further amendment to correct deficiencies that may be correctable. (*See* Count III *infra*, respecting ¶ 67(e) of the Amended Complaint).

**Count IV:** Negligent Mismanagement:

This count, which is asserted against all defendants, alleges that "implementation of their grandiose scheme for TriFoods' future growth . . . in only eighteen months destroyed TriFoods." Plaintiff asserts that the facts alleged, which sketch that "scheme" and those results, constitute mismanagement and waste.

The allegations of Count IV are detailed. They assert most centrally that prior to his dismissal Gagliardi disagreed with Hart concerning the wisdom of TriFoods manufacturing its products itself and disagreed strongly that the company should buy a plant in Pomfret, Connecticut and move its operations to that state. Plaintiff thought it foolish (and he alleges that it was negligent judgment) to borrow funds from CDA for that purpose. ¶¶ 71–74; 77–81.

Plaintiff also alleges that Hart caused the company to acquire and fit-out a research or new product facility in Chadds Ford Pennsylvania, which "duplicated one already available and under lease to Designer Foods [the predecessor name of TriFoods], and which was therefore, a further waste of corporate assets." ¶ 76.

Next, it is alleged that "defendants either acquiesced in or approved a reckless or grossly negligent sales commission to build volume." ¶ 82.

Next, it is alleged that "Hart and the other defendants caused TriFoods to purchase [the exclusive rights to produce and sell a food product known as] Steak-umms from Heinz in April 1994." ¶ 85. The price paid compared unfavorably with a transaction in 1980 in which this product had been sold and which earlier terms are detailed. ¶ 86. "Defendants recklessly caused TriFoods to pay $15 million for Steak-umms alone (no plant, no equipment, etc) which was then doing annual sales of only $28 million." *Id.*

Next, it is alleged that "Hart caused Tri-Foods . . . to pay $125,000 to a consultant for its new name, logo and packaging." ¶ 87.

Next, it is alleged that Hart destroyed customer relationships by supplying inferior products. ¶¶ 88–91.

Next, it is alleged that "Hart refused to pay key manufacturers and suppliers . . . thus injuring TriFoods' trade relations." ¶ 92.

Next, it is alleged that "defendants entered into a transaction whereby TriFoods was to acquire "Lloyd's Ribs" at a grossly excessive price, knowing (or recklessly not knowing) that the Company could not afford the transaction." ¶ 93.

Lastly, with respect to the mismanagement count, it is alleged that defendants ignored plaintiff's warnings as to each of the above; that Hart was fired in May 1995; and that a settlement was reached between Hart and the Company. ¶¶ 94–97. All of the foregoing lead to the current condition of the company, which is very weak financially.

■ Do these allegations of Count IV state a claim upon which relief may be granted? In addressing that question, I start with what I take to be an elementary precept of corporation law: in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith.[4] There is a theoretical excep-

---

4. I include within the category of improper motivation those cases in which particularized claims of director entrenchment are made. *E.g. Cheff v. Mathes*, Del.Supr., 199 A.2d 548 (1964); *Unitrin, Inc. v. American General Corp.*, Del.Supr., 651 A.2d 1361 (1995); Or in which, relatedly, transfers of corporate control by the board, as described in *Revlon v. MacAndrews & Forbes Holdings*, Del.Supr., 506 A.2d 173 (1986) or more pertinently *Paramount Communications v. QVC Network*, Del.Supr., 637 A.2d 34 (1994) are involved. Finally, I note that in making this simple statement, I count *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985), not as a "negligence" or due care case involving no loyalty issues, but as an early and, as of its date, not yet fully rationalized, "Revlon" or "change in control" case. *See* Jonathan Macey and Geoffrey

tion to this general statement that holds that some decisions may be so "egregious" that liability for losses they cause may follow even in the absence of proof of conflict of interest or improper motivation. The exception, however, has resulted in no awards of money judgments against corporate officers or directors in this jurisdiction and, to my knowledge only the dubious holding in this Court of *Gimbel v. Signal Companies, Inc.,* (Del. Ch.) 316 A.2d 599 *aff'd* (Del.Supr.) 316 A.2d 619 (1974), seems to grant equitable relief in the absence of a claimed conflict or improper motivation.[5] Thus, to allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary *acting in a good faith pursuit of corporate purposes,* does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect.

The rule could rationally be no different. Shareholders can diversify the risks of their corporate investments. Thus, it is in their economic interest for the corporation to accept in rank order all positive net present value investment projects available to the corporation, starting with the *highest risk adjusted rate of return first.* Shareholders don't want (or shouldn't rationally want) directors to be risk averse. Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital.

But directors will tend to deviate from this rational acceptance of corporate risk *if* in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims of derivative liability for any resulting corporate loss.

Corporate directors of public companies typically have a very small proportionate ownership interest in their corporations and little or no incentive compensation. Thus, they enjoy (as residual owners) only a very small proportion of any "upside" gains earned by the corporation on risky investment projects. If, however, corporate directors were to be found liable for a corporate loss from a risky project on the ground that the investment was too risky (foolishly risky! stupidly risky! egregiously risky!— you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution). Given the scale of operation of modern public corporations, this stupefying disjunction between risk and reward for corporate directors threatens undesirable effects. Given this disjunction, only a very small probability of director liability based on "negligence", "inattention", "waste", etc., could induce a board to avoid authorizing risky investment projects to any extent! Obviously, it is in the shareholders' economic interest to offer sufficient protection to directors from liability for negligence, etc., to allow directors to conclude that, as a practical matter, there is no risk that, if they act in good faith and meet minimal proceduralist standards of attention, they can face liability as a result of a business loss.

■ The law *protects shareholder investment interests* against the uneconomic consequences that the presence of such second-guessing risk would have on director action and shareholder wealth in a number of ways. It authorizes corporations to pay for director and officer liability insurance and authorizes corporate indemnification in a broad range of cases, for example. But the first protection against a threat of sub-optimal risk acceptance is the so-called business judgment rule. That "rule" in effect provides that where a

Miller, *TransUnion Reconsidered,* 98 Yales L.J. 127. As such I see it as reflecting a concern with the TransUnion board's independence and loyalty to the company's shareholders in a critical "sale of the company" context.

**5.** Interestingly, the obviously problematic nature of entering an injunction (even a preliminary injunction) against directors, *while at the same*

time holding that they were neither suffering from any conflicting interest nor acting in bad faith, caused the *Gimbel* court to impose a bond that was unprecedented in size especially for the period ($25 million) and which, in fact, was never satisfied. Therefore, while the court indicated its conditional willingness in *Gimbel* to enter an injunction, in fact no relief ever issued.

director is independent and disinterested, there can be no liability for corporate loss, unless the facts are such that no person could possibly authorize such a transaction if he or she were attempting in good faith to meet their duty. *Saxe v. Brady*, Del.Ch., 184 A.2d 602 (1962).

■ Thus, for example it does not state a claim to allege that: (1) Hart caused the corporation to pay $125,000 to a consultant for the design of a new logo and packaging. On what possible basis might a corporate officer or director be put to the expense of defending such a claim? Nothing is alleged except that an expenditure of corporate funds for a corporate purpose was made. Whether that expenditure was wise or foolish, low risk or high risk is of no concern to this Court. What is alleged certainly does not bring the allegation to within shouting distance of the *Saxe v. Brady* principle. (2) Nor does an allegation that defendants acquiesced in a reckless commission structure "in order to build volume" state a claim; it alleges no conflicting interest or improper motivation, nor does it state facts that might come within the *Saxe v. Brady* principle. It alleges only an ordinary business decision with a pejorative characterization added. (3) The allegation of "duplication" of existing product research facilities similarly simply states a matter that falls within ordinary business judgment; that plaintiff regards the decision as unwise, foolish, or even stupid in the circumstances is not legally significant; indeed that others may look back on it and agree that it was stupid is legally unimportant, in my opinion. (4) That the terms of the purchase of "Steak-umms" seem to plaintiff unwise (especially when compared to the terms of a 1980 transaction involving that product) again fail utterly to state any legal claim. No self-interest, nor facts possibly disclosing improper motive or judgment satisfying the waste standard are alleged. Similarly, (5) the allegations of corporate loss resulting from harm to customer relations by delivery of poor product and (6) harm to

supplier relations by poor payment practices, again state nothing that constitutes a legal claim. Certainly these allegations state facts that, if true, constitute either mistakes, poor judgment, or reflect hard choices facing a cash-pressed company, but where is the allegation of conflicting interest or suspect motivation? In the absence of such, where are the facts that, giving the pleader all reasonable inferences in his favor, might possibly make the *Saxe v. Brady* principle applicable? There are none. Nothing is alleged other than poor business practices. To permit the possibility of director liability on that basis would be very destructive of shareholder welfare in the long-term.

A similar analysis holds for the allegations concerning a contract to acquire the product "Lloyd's Ribs" (7); nothing is alleged other than that the price was excessive and the directors knew (or recklessly didn't know) that "the company could not afford such a transaction." More importantly, the complaint does not allege that the contract was ever closed! Indeed in Count V it is alleged that certain defendants diverted the opportunity to acquire Lloyd's Ribs from TriFoods! Thus, with respect to this possible transaction, not only does the amended complaint contain no allegation of conflict of interest or improper motivation in TriFoods' acquiring "Lloyd's Ribs," but it contains no allegation that a transaction involving the company ever occurred.

Finally, (8) there is the allegation that despite warnings from plaintiff and despite the alleged fact that the Pomfret facility "was not reasonably fit" for the purpose, the directors authorized the purchase of the facility at a "grossly excessive" price in order to implement a business plan that would have the company manufacture some or all of its food products and that defendants caused the company to borrow substantial funds to accomplish that task. Once more there is no allegation of conflict of interest with respect to this transaction [6], nor is there any allega-

---

**6.** It was suggested at oral argument by plaintiff's counsel that the investors who controlled the board at this time were driven by a desire to make the company appear attractive to a future IPO market (i.e. an initial public offering of its stock) and that the desire to have some "bricks and mortar" for that purpose motivated them with respect to the Pomfret transaction, even though it was a poor deal from a business point of view. While one may disagree with the wis-

tion of improper motivation in authorizing the transactions. There is, in effect, only an allegation that plaintiff believes the transaction represents poor business judgment and the conclusion that "no reasonable business person would have engaged in it." ¶ 81. Thus this claim does attempt to plead the *Saxe v. Brady* test of corporate waste.

Does this attempt to plead a claim respecting the Pomfret move survive a motion to dismiss? Under the general notice pleading rules this conclusory addition to allegations that otherwise clearly fall within the ambit of the business judgment rule might perhaps be regarded as sufficient to proceed to discovery. CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE: Civil 2d § 1215 (1990 and 1995 Supp.). But it is not clear that, where derivative claims are involved, good policy supports the same result. Asserting a derivative claim allows an attorney in the role of agent for shareholders to exert substantially magnified settlement pressure on a defendant. The risk/reward situation of the individual director defendants (discussed above), coupled with the ordinary workings of indemnification rights and insurance, means that very, very few derivative suits reach trial. Strike suits are a greater threat in this context than in civil litigation between two principals. Thus, in such cases the consequences of surviving a motion to dismiss are, as a practical matter, substantially more significant than in garden variety civil litigation.

It is rational and good policy for the law to filter such cases at an early stage more finely than the Rule 12(b)(6) test permits. This in effect can be done through the operation of Rule 23.1, which modifies the notice pleading standard by requiring plaintiff to plead with particularity either that plaintiff has sought to induce the board to bring the action and that the board has failed or refused to do so for no good reason *or* the reason plaintiff has not sought the board's action. *See generally Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984); *Rales v. Blasband*, Del.Supr., 634 A.2d 927 (1993); *Spiegel v. Buntrock*, Del. Supr., 571 A.2d 767 (1990).

▮▮▮ Defendants have moved to dismiss Count IV on the basis that plaintiff has failed to satisfy the pleading requirements of Rule 23.1. With respect to most of the allegations of this count, I grant the motion to dismiss on the fundamental ground that without regard to Rule 23.1 plaintiff has simply failed to allege facts from which a valid cause of action can be inferred, but with respect to the claim (8) that attempts to plead a waste or mismanagement claim premised on the facts relating to the decision to expend funds and enter into transactions in connection with the acquisition of the Pomfret facility, I grant the motion on the basis that plaintiff has admittedly made a demand upon the board, that the board has indicated both in its response to plaintiff and equally importantly through its motion to dismiss this suit, that in its judgment the corporation's interests will not be advanced by pursuing this litigation and no good reason not to respect that judgment has been alleged.[7] The test for whether derivative adjudication of this claim may proceed is whether the TriFoods board was so situated with respect to the Pomfret transactions that any exercise of business judgment by the board with respect to those transactions (i.e., the loan, the purchase, the moving, etc.) was inherently subject to reasonable doubt as to whether it was affected by an interest or motive disqualifying it from business judgment protection.

dom of any such strategy, if it existed, any interest in making the company appear attractive as an IPO investment, if present, was an interest that all shareholders shared and did not represent a financial conflict of interest with respect to the Pomfret transaction.

7. Plaintiff seeks to survive this motion with an allegation that the board itself never did address his demand, but that an officer and corporate attorney did so without board involvement. Thus he says any such purported denial of his request will be proven to be ineffective. He asserts that in all events there is now a factual issue with respect to the effectiveness of the board rejection that precludes termination of his suit on the basis of Rule 23.1 at this stage. It is, however, undisputed that Mr. Gagliardi made a pre-suit demand, that the corporation did not institute the suit, that plaintiff did and that the corporation has moved to dismiss under Rule 23.1. These undisputed facts establish the board's official response to the demand and make irrelevant the issue that plaintiff seeks to explore through discovery.

*Aronson,* 473 A.2d at 814; *Spiegel,* 571 A.2d at 774; *Rales,* 634 A.2d at 933. Of course no such interest or motive is alleged and thus no reason to permit the shareholder to second-guess the board decision not to prosecute this claim is alleged. I should note that it is well established that the simple expedient of naming a majority of otherwise disinterested and well motivated directors as defendants and charging them with laxity or conspiracy etc., will not itself satisfy the standards for permitting a shareholder to be excused from demand or to override a board decision not to litigate a corporate claim. *See Aronson,* 473 A.2d at 815; *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984).

For the foregoing reason Count IV of the amended complaint will be dismissed.

\*     \*     \*

Defendants may submit a form of order, on notice, in conformity with the foregoing.