214 B.R. 945 (1997)
In re BIG WHEEL HOLDING COMPANY, INC., Fishers Big Wheel, Inc., and Big Wheel of Michigan, Inc., Debtors.
Darrel H. COX; Mike Pasulka and Kayvonne Pasulka; Robert W. Lytle and Geraldine Lytle; Merritt R. Cramer and Patricia Cramer; Zachary E. Sideris and Susan P. Sideris; Homer W. Helter and Diana Helter; John N. Tomasetti and Kathleen M. Tomasetti; Richard P. Giordano, Jr., and Sandra M. Giordano; Kenneth G. Carothers and Marie Carothers; Bette McDevitt; Carl Schwartz and Constance E. Schwartz; Edward J. Gerrick and Jacqueline E. Gerrick; Richard L. Gary, Sr., and Stella M. Gary; Larry Joe Lynn and Jennifer S. Lynn; Patrick D. Nicholson and Barbara A. Nicholson; Norman J. Henderson and Edith R. Henderson; Allan B. Cunningham, Sr. and Jacquelyn L. Cunningham; Stephen Reinhard and Paula Reinhard; Arthur L. Beck; Steve Lynn; Charles R. Ford and Catherine Ann Ford; Janet Smith; Sidney Altschuler; Dorothy Lou Gleich; Bernard Davis and Ruth Lillian Davis; Hac & Company; Ada L. Pearlstein; Robert W. Figuly and Bertha V. Figuly; John M. Len, II; Lynne Davis Dellinger; Clara Scilla; David F. Ruppen and Mary Carol Ruppen; Elizabeth A. Conner; Josephine Delillo; Stanley Brenner and Naomi Brenner; Marene Rothman, Custodian for Cheryl G. Rothman, and Gregory A. Rothman; Jacqueline Amper; Thomas J. Devlin, Jean E. Devlin and Thomas J. Devlin, Jr.; Stephen A. Rowe and Barbara A. Rowe; Wallace Ave. Assoc.; and Albert A. Agostonelli, Jr. and A.A. Agostonelli, III, Plaintiffs,
v.
Marshall HESS; Marianne Hess; Ruth-Ann Mendel; Gail Wolpin; Carolyn Hess-Abraham; Andrew Hess; Daniel Hess; Gail Wolpin, Custodian Under the Uniform Gift to Minors Act for Daniel Wolpin and Laura Wolpin; Ruth-Ann Mendel, Trustee Under the Agreement Known as The Lawrence Fisher Trust for the Benefit of Michael Fisher; Ruth-Ann Mendel, Custodian Under the Uniform Gift to Minors Act for Michael Fisher; Ruth-Ann Mendel, Trustee Under the Agreement Known as the Lawrence Fisher Trust for the Benefit of Diana Fisher; and Ruth-Ann Mendel, Custodian Under the Uniform Gift to Minors Act for Diana Fisher, Defendants.
Nos. 93-796, 93-797 and 93-798, CIV. A. No. 97-181-RRM.
United States District Court, D. Delaware.
November 19, 1997.
*946 David B. Stratton, and David M. Fournier, Esquire, Pepper, Hamilton & Scheetz, Wilmington, DE, Stephen J. Laidhold, David W. Lampl, and Thomas M. Ferguson, Sable, Makoroff & Gusky, P.C., Pittsburgh, PA, for plaintiffs.
Neil Glassman, Bayard, Handelman & Murdoch, P.A., Wilmington, DE, Robert J. Rosenberg, and James E. Brandt, Latham & Watkins, New York City, for defendants.

*947 OPINION
McKELVIE, District Judge.
This is a bankruptcy case. Big Wheel Holding Company, Inc., Fishers Big Wheel, Inc., and Big Wheel of Michigan, Inc. (collectively referred to herein as "Big Wheel") are debtors in a Chapter 11 proceeding. Big Wheel is a privately held corporation. Plaintiffs in this action are a group of shareholders that own approximately 4% of the shares of Big Wheel. Defendants own approximately 87% of the company's shares and include former directors of the company.
On July 8, 1993, Big Wheel voluntarily petitioned for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101, et. seq., in the United States Bankruptcy Court for the District of Delaware. Over the next several months, Big Wheel and the Official Committee of Creditors drafted a reorganization plan for the company. The plan included payment to unsecured creditors of approximately $11 million, as well as an equity fund of $2.2 million to be distributed pro rata among Big Wheel's stockholders.
On August 22, 1994, plaintiffs commenced an adversary proceeding against defendants in the bankruptcy court. Plaintiffs allege that defendants "as officers, directors, and controlling shareholders exploited their positions and usurped corporate opportunities." Plaintiffs also allege that defendants engaged in "impermissible self-dealing, and otherwise violated [their] duty of loyalty to the minority shareholders."
Plaintiffs claim that they suffered damage through defendants' usurpation of corporate opportunities, and through defendants' self-dealing in the drafting of the reorganization plan. Plaintiffs contend that defendants should have shared with plaintiffs the money they received in connection with their role in two partnerships that leased property to Big Wheel. Plaintiffs claim that defendants breached fiduciary duties owed to Big Wheel by taking for themselves an opportunity that belonged to it. Plaintiffs also contend that the bankruptcy reorganization plan should have taken into account this inequitable conduct, instead of allowing defendants to recover their pro rata share of the equity fund. Plaintiffs argue that, as a remedy for defendants' misconduct, the court should subordinate defendants' claims on Big Wheel's estate to those of plaintiffs pursuant to 11 U.S.C. § 510(c)[1]. Specifically, plaintiffs seek an order allowing them to distribute the full $2.2 million equity fund among themselves, leaving nothing to defendants.
In August 1994, at the time of plaintiffs' complaint, Big Wheel's reorganization plan was awaiting confirmation by the bankruptcy court. Because the plaintiffs were concerned that the disbursement of monies from the equity fund would render their equitable subordination action moot, on the same day they commenced this adversary proceeding they moved for a preliminary injunction enjoining the distribution of monies from the equity fund pending the adjudication of the equitable subordination action.
On September 9, 1994, the bankruptcy court confirmed Big Wheel's reorganization plan. The plan provided that the bankruptcy court would retain jurisdiction over all adversary proceedings pending as of the confirmation date.
On October 26, 1994, Chief Judge Balick denied plaintiffs' motion for a preliminary injunction. Plaintiffs thereafter sought emergency injunctive relief in this court. On November 2, 1994, this court denied plaintiffs' request to enjoin the disbursement of monies from the equity fund after defendants agreed to waive any mootness defense, and agreed to a money judgment remedy in the event plaintiffs prevailed on their equitable subordination claims.
Pursuant to a stipulated scheduling order, discovery in the equitable subordination action began on February 15, 1995 and ended on March 31, 1995. On April 14, 1995, the parties filed cross-motions for summary *948 judgment. Each party submitted to the bankruptcy court briefs in support of its motion, along with supporting affidavits. Briefing on the motions was completed on May 8, 1995.
On February 19, 1997, plaintiffs filed a motion in this court to withdraw the reference of the equitable subordination action from the bankruptcy court, reporting that while briefing on the cross-motions for summary judgment had been completed for some time, the bankruptcy court had not heard argument or decided the motions. Plaintiffs filed a copy of that motion with the bankruptcy court on that day. On May 21, 1997, this court granted plaintiffs' motion to withdraw the reference. The court heard oral argument on the motions on July 30, 1997. This is the court's decision on those motions.
I. FACTUAL BACKGROUND
The following facts are drawn from the parties' briefs, accompanying evidentiary submissions, the record of proceedings in the bankruptcy court, and oral argument before this court on July 30, 1997.
Prior to 1994, Big Wheel was a privately owned, closely-held Pennsylvania corporation with headquarters in New Castle, Pennsylvania. Big Wheel operated discount department stores throughout the northeastern region of the United States. As part of a general expansion effort beginning in the late 1960s, Big Wheel identified various locations for new retail outlets. The company subsequently entered into contracts with third-party developers. The developers agreed to purchase parcels of real estate that would be transformed into Big Wheel stores, and agreed to lease the property to Big Wheel. The financing for store construction efforts was non-recourse to the third-party owners, meaning that the third-party owners were not personally liable for the loans used to purchase the real estate and build the stores. These loans were secured by mortgages on the properties.
In 1973, Marshall Hess succeeded Edward Fisher as Chief Executive Officer of Big Wheel. Hess subsequently developed a stock option program for senior executives and permitted other employees to purchase shares at book value.
In the early 1980s, Big Wheel management decided that it would be in the company's best financial interests to own retail outlets, rather than continuing to lease them from third-party developers. Thus, the company proceeded to construct and operate eight such stores.
In late 1983 or early 1984, Hess met with Tom Mosimann, a vice president at Mellon Bank, to discuss the company's existing line of credit and other financial matters. Mellon Bank had served as Big Wheel's primary lender for more than six decades. Mosimann indicated to Hess that Mellon was concerned about Big Wheel's ownership of real estate, for two reasons. First, in the event that Big Wheel were to enter Chapter 11 proceedings, it might have to sell the outlets, rather than simply disaffirm existing leases. Second, construction of retail outlets added excessive long-term debt to the company's books and impacted negatively on Big Wheel's debt-to-equity ratios.
Following the meeting with Mosimann, Hess sought the advice of Big Wheel's general counsel, Richard Burdman. On April 27, 1984, Burdman sent a letter to Hess, advising him to discontinue the company's retail ownership program. Burdman wrote:
You had indicated to me that people at the Mellon National Bank have advised you that they would prefer to see you lease your real estate from outsiders so that in the event your Company were, at any time, to be in financial difficulty, you would be in a position to, pursuant to the provisions of Chapter 11 of the Bankruptcy Code, enter into a plan whereby you could affirm or disaffirm certain of your leases rather than being obligated to otherwise dispose of the real estate. . . . [I]f it is their decision that you should now own buildings and you intend to continue doing business with them, then I would suggest that you have no other option but to arrange to lease your buildings from third parties or seek other corporate financing.
Pursuant to Burdman's advice, Big Wheel's board of directors voted to discontinue plans to construct and operate additional *949 retail outlets. Hess subsequently informed senior executive officers, including some of the plaintiffs in this action, about the board's decision.
Since Big Wheel would no longer own outlets directly, the directors decided to lease stores developed by two limited partnerships, MRG, Ltd. and HFW. Co. Hess was the general partner of both partnerships. The lease agreements with these partnerships were very similar to agreements Big Wheel had made with prior third-party landlords. The company's rent payments were calculated by amortizing the total cost of the lease over twenty years and adding 10% of that amortized amount for lessor's profits.
As was true in similar arrangements with third-parties, the debt incurred by the partnerships as a result of developing the retail outlets for Big Wheel was non-recourse to the partnerships. It was secured by a mortgage on the properties where the retail outlets were located. However, unlike the third-party agreements, the partnerships' debt was also secured by an assignment of the Big Wheel leases from the partnerships to the lenders, and a guarantee by Big Wheel.
From 1985 through 1990, Big Wheel conducted annual shareholders' meetings, during which Hess made presentations concerning the company's financial situation. Additionally, shareholders received annual reports containing financial statements audited by Coopers & Lybrand. The statements not only recited the minimum annual rent paid by Big Wheel to the partnerships, but also included the following information:
Leases covering certain store properties and office facilities are with entities over which the Company exercises management control through common officers and/or shareholders (affiliates). . . . The Company has guaranteed, upon the default of the affiliates, the continuation of payments under terms of the original loan of the principal (current amount) and interest related to the affiliated lessor's borrowings used to finance the construction of the leased properties.
Minutes from Big Wheel's annual meetings during the 1985-1990 period indicate that Big Wheel shareholders unanimously adopted the following resolutions:
Upon motion made and duly seconded, the following resolution was unanimously adopted:
RESOLVED, that the annual report for the year ended . . . by Coopers and Lybrand be accepted and filed.
RESOLVED, that the actions of the Officers and Directors of this Corporation since the last annual meeting be, and the same hereby are, fully ratified, approved and confirmed.
From early 1985 through July 8, 1993, as a result of money made from the lease agreements, the partnerships distributed approximately $2.2 million in cash to defendants. Defendants also received tax losses or deduction benefits in the amount of at least $7 million as a result of their interests in the partnerships.
During the fiscal years dating from 1989 through 1992, Big Wheel did not generate operating profits from its retail business. From 1990 through July 8, 1993, the company closed approximately forty retail outlets. About twenty of those stores were owned by the limited partnerships, and a roughly equal number was owned by third-party landlords.
In early 1992, Big Wheel entered into negotiations with its creditors in an attempt to create a restructuring plan that would cut costs and stabilize Big Wheel's finances. As part of this plan, defendants agreed to reduce their profit margin on Big Wheel's rental payments to the partnerships by approximately 50%.
On July 8, 1993, Big Wheel voluntarily petitioned for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101, et seq., in the United States Bankruptcy Court for the District of Delaware. The company filed the petition after the company's creditors examined all of the transactions giving rise to the competing claims of the various creditor groups  including the transactions among Big Wheel and the partnerships.
At the time of the bankruptcy filing, Big Wheel had approximately 13,000 shares of common outstanding stock. Of those shares, *950 87% were owned by defendants. Plaintiffs, comprised primarily of former senior officers of Big Wheel and their spouses or other family members, owned approximately 4% of the outstanding shares of common stock.
Following extended negotiations over the next several months, Big Wheel and the Official Committee of Creditors drafted a plan of reorganization for the company. The plan specified that the company's assets would be sold off and distributed to creditors. It provided for a satisfaction of priority claims and secured creditors first, and then for a pro rata payment to unsecured creditors from the remainder. The plan also provided for the creation of an equity fund of $2.2 million (after the payment of administrative and priority claims) to be distributed pro rata among Big Wheel's stockholders.
Plaintiffs have submitted a copy of the "Debtor's Second Amended Joint Plan of Reorganization" ("the Plan"), dated July 12, 1994. The Plan contains an analysis in appendix 5, listing the expected liquidation recoveries under the Plan for each class of creditors. It appears that after paying administrative expenses, priority claims, and secured claims (totalling about $24 million), just over $13 million remains for distribution. The Plan calls for almost $11 million to be distributed pro rata among the unsecured creditors groups. It lists the recovery rates for the unsecured creditor groups as being between 9% and 15% of the amounts due, which means that Big Wheel owes approximately $80 million to unsecured creditors.
The remaining $2.2 million was set aside for an equity fund to be distributed pro rata among shareholders. From the distribution of the equity fund, defendants were to receive approximately $1.9 million (87% of $2.2 million), and the plaintiffs were to receive approximately $88,000 (4% of $2.2 million).
The reorganization Plan also specified that the defendants were released from liability to creditors, including liability for Big Wheel's dealings with Hess' real estate partnerships. Plaintiffs, however, provided notice to the parties in interest prior to confirmation of the Plan by the bankruptcy court that they believed that defendants' had breached fiduciary duties owed to minority shareholders (including plaintiffs).
On August 22, 1994, plaintiffs commenced this proceeding in the bankruptcy court, seeking equitable subordination. This is the court's decision on the parties' cross-motions for summary judgment on the equitable subordination claim.
II. DISCUSSION
A. Summary Judgment Standard
Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.
Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating the absence of material issues of fact. Id. at 323, 106 S.Ct. at 2552-53. However, the moving party need not support its motion with affidavits or other documents disproving the nonmoving party's claim, but need only "show[]  that is point[] out to the district court  that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S.Ct. at 2554. The nonmoving party must then go beyond the pleadings and through affidavits or other evidence demonstrate the existence of a genuine issue of material fact. Id. at 324, 106 S.Ct. at 2553. In making this evidentiary demonstration, the nonmoving party "must introduce more than a mere scintilla of evidence showing that there is a genuine issue for trial; [he] must introduce evidence from which a rational finder of fact could find in [his] favor." Colburn v. Upper Darby Township, 946 F.2d 1017, 1020 (3d Cir.1991) (quotations *951 and citations omitted). However, the district court is required to construe the evidentiary record so as to give the nonmoving party reasonable factual inferences. Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 112 (3d Cir.1996).
B. Equitable Subordination Standard
Plaintiffs bring their claim for equitable subordination pursuant to 11 U.S.C. § 510(c), which states in relevant part:
[A]fter notice and a hearing, the court may 
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed interest.
This statute, and the relief of subordination, "should be applied only in limited circumstances." In re Fabricators., Inc., 926 F.2d 1458, 1464 (5th Cir.1991). See also In re Cajun Electric Power Cooperative, Inc., 119 F.3d 349, 356 (5th Cir.1997) (explaining that "[e]quitable subordination is remedial in nature and is only rarely granted"). Plaintiffs must establish that circumstances warrant this court's award of an equitable remedy.
Most courts considering § 510(c) have used the three-part test announced in In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir.1977). See e.g., Cajun Electric, 119 F.3d at 357; In re 5000 Skelly Corp., 1994 WL 232242, * 1 (10th Cir. June 1, 1994); In re 604 Columbus Avenue Realty Trust, 968 F.2d 1332, 1353 (1st Cir.1992); In re Lemco Gypsum, Inc., 911 F.2d 1553, 1556 (11th Cir.1990). This test states that for a court to subordinate a claim, the party seeking subordination must establish that:
(1) the claimant engaged in some type of inequitable conduct,
(2) the misconduct resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and
(3) the subordination of the claim is not inconsistent with the Bankruptcy Act.
Mobile Steel, 563 F.2d at 700. Recently, some courts have suggested that the first prong of the test, requiring inequitable conduct, is unnecessary. See In re Burden v. United States, 917 F.2d 115, 120-21 (3d Cir. 1990) (finding creditor misconduct not necessary for equitable subordination of nonpecuniary loss tax penalties); In re Envirodyne Indus., Inc., 79 F.3d 579 (7th Cir.1996) (finding that inequitable conduct is not a prerequisite to equitable subordination). However, the scope of these holdings is not clear. See U.S. v. Noland, 517 U.S. 535, ___, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996) (stating that subordination might be appropriate in cases like Burden "because of the nature of [the facts in that case]," but finding it unnecessary to decide whether inequitable conduct was a prerequisite to subordination under § 510(c)); Burden, 917 F.2d at 121-22 (Judge Alito, implying in dissent that the holding is limited to cases involving tax penalties, stated that the majority "treats nonpecuniary loss tax penalties less favorably than other categories of unsecured claims"). For the purposes of defendants' summary judgment motion, however, the court does not need to resolve this issue, since it must take plaintiffs' allegations of defendants' misconduct as true. Thus, the court will assume that inequitable conduct did take place, and consider whether subordination is justified under Mobile Steel's second prong, which requires some injury to creditors or unfair advantage to the claimant.
C. Does Defendants' Alleged Usurpation of a Corporate Opportunity Warrant Equitable Subordination?
A director may not take a business opportunity for his or her own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his or her own, the officer or director will thereby be placed in a position inimicable to his or her duties to the corporation. See Broz v. Cellular Info. Systems, Inc., 673 A.2d 148, 154-55 (Del.1996). This is called the "corporate opportunity doctrine." Id. at 154. The vehicle for remedying a violation of the corporate opportunity doctrine is a derivative suit. See Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1055 (Del.Ch.1996) (interpreting an allegation of a usurpation of corporate *952 opportunity as being a derivative claim, since there is no duty in such a case to the minority shareholders as individuals). A derivative suit is one where an individual brings suit on behalf of the corporation, since the alleged wrongdoing caused injury to the corporation, but did not "directly and specially" cause injury to the individual plaintiff. Benerofe v. Cha, 1996 WL 535405, *10 (Del.Ch., Sept. 12, 1996).
Plaintiffs claim that defendants engaged in inequitable conduct by creating the family partnerships and profiting from these partnerships, without sharing these profits and benefits with plaintiffs. However, this claim amounts to no more than a claim of usurpation of a corporate opportunity, and thus is a derivative claim. Defendants do not have a duty to share such an opportunity with plaintiffs, but rather owe a duty not to take the opportunity from the corporation. See Gagliardi, 683 A.2d at 1055 (finding no Delaware precedent requiring a fiduciary to offer a corporate opportunity to minority shareholders, but rather fiduciary must defer to the corporation); Field v. Allyn, 457 A.2d 1089, 1099-1100 (Del.Ch.1983) (finding that directors need not share a business opportunity with "so many of the minority shareholders as may desire to come along"). Plaintiffs' only claim of injury is that had defendants not taken the business opportunity, Big Wheel might have benefitted, and thus the value of plaintiffs' shares would have been greater. Their only possible injury is a vicarious one.
However, due to the financial state of Big Wheel, plaintiffs cannot recover for this possible injury to the value of their stock. Defendants allegedly received about $2.2 million from the partnerships. The reorganization plan indicates that Big Wheel owes almost $80 million to unsecured creditors, and is only able to pay about $11 million. Even if all of the money that defendants earned from the partnerships was returned to Big Wheel in a derivative suit, plaintiffs have not identified facts to show that it would have forestalled Big Wheel's subsequent bankruptcy filing. Plaintiffs would not be entitled to recover any of that money, since it would simply have been used to pay more to the unsecured creditors, who are entitled to compensation in bankruptcy before payment of shareholder claims. See 11 U.S.C. § 726. Thus, defendants' actions with respect to the partnerships, even if they amounted to usurpation of a corporate opportunity, do not warrant a remedy of equitable subordination for plaintiffs.
D. Did Defendants' Negotiation of the Reorganization Plan Warrant Equitable Subordination?
Plaintiffs also suggest that defendants engaged in misconduct by negotiating a reorganization plan that results in defendants receiving a pro rata share of the equity fund. Plaintiffs allege that fairness dictates that defendants' share should be reduced or eliminated due to their earlier misconduct. By not reducing defendants' share, plaintiffs allege that defendants received the "unfair advantage" required in the second prong of the Mobile Steel test.
As mentioned above, the only remedy available for defendants' taking of a corporate opportunity is payment by defendants to the corporation. Defendants would not be asked to forfeit their interest in the corporation. Defendants would still be entitled to receive their pro rata share of the company's assets, as shareholders in the company. Thus, the fact that defendants recover a share of the equity fund is not an unfair advantage. Rather, the result is the same as it would be if defendants were found liable for usurping a corporate opportunity.
Again, it should be emphasized that plaintiffs are not suffering any loss because of the details of the reorganization plan or because defendants took a corporate opportunity. It appears that Big Wheel would have declared bankruptcy either way. Plaintiffs do recover some money from the reorganization plan, despite the fact that their claims are inferior to those of the unsecured creditors, and the creditors are receiving a small percentage of the money owed to them. There is no injury to plaintiffs since they are recovering money that they have no entitlement to, and no unfair advantage to defendants.
*953 It is also important to note that the unsecured creditors have agreed to the reorganization plan, which includes a waiver of all claims against defendants for their transactions with the partnerships. This suggests that the unsecured creditors do not place any significant value on the derivative claims, since any recovery by Big Wheel would be money that these creditors would be entitled to recover. The settlement of these claims in the plan is further proof that defendants are not receiving any unfair advantage.
Section 510(c) offers an equitable remedy. The purpose of the equitable subordination statute is to see that "injustice and unfairness is not done in the administration of the bankrupt estate." In re Nutri/System of Florida Assoc., 178 B.R. 645, 656 (E.D.Pa.1995) (quoting Pepper v. Litton, 308 U.S. 295, 307-08, 60 S.Ct. 238, 245-46, 84 L.Ed. 281 (1939)). The remedy is specifically addressed to fairness within the bankruptcy process, not to general fairness between any two creditors. The "unfair advantage" in the Mobile Steel test refers to an advantage by one creditor over another in that process. In Mobile Steel, the court explained that subordination was a possible remedy for "any unfair act . . . which affects the bankruptcy results to other creditors." 563 F.2d at 700 (quoting In re Kansas City Journal-Post Co., 144 F.2d 791, 803-04 (8th Cir.1944)) (emphasis added).
Plaintiffs have not shown that any conduct by defendants had any effect on the bankruptcy results, and have specifically not shown that plaintiffs might have recovered more in bankruptcy if defendants had acted differently. They have not shown any evidence that defendants will recover more under the reorganization plan than they would have if they had acted differently. In sum, plaintiffs have not shown any action by defendants that might justify the remedy of equitable subordination.
III. CONCLUSION
In order to justify the remedy of equitable subordination, plaintiffs must show that any inequitable conduct by defendants either caused injury to creditors or resulted in unfair advantage to defendants. The court finds that no reasonable trier of fact could conclude that defendants' actions were detrimental to the creditors of Big Wheel, or created an unfair advantage for defendants in the bankruptcy process. Thus, the court will grant defendants' motion for summary judgment on the plaintiffs' claim for equitable subordination, and deny plaintiffs' motion for summary judgment on the claim of equitable subordination.
The court will issue an order in accordance with this opinion.
NOTES
[1] Section 510(c) provides in relevant part:

(c) [A]fter notice and a hearing, the court may 
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . .