Aaron E. LANDY, Jr., Plaintiff,

v.

David D'ALESSANDRO, Michael Bell, Wayne A. Budd, John Connors, Robert J. Davis, Richard B. Dewolfe, Robert E. Fast, Maureen Ford, Thomas P. Glynn, Michael G. Hawley, Edward H. Linde, Judith A. Mchale, Thomas E. Moloney, R. Robert Popeo, Richard F. Syron, Robert J. Tarr, Jr., Stephen L. Brown, Defendants,

and

John Hancock Financial Services, Inc., Nominal Defendant.

No. CIV.A.03–11000–REK.

United States District Court, D. Massachusetts.

March 30, 2004.

---

Aaron E. Landy, Jr., Adkins, Kelston and Zavez, P.C., Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Plaintiff.

Jeffrey B. Rudman, Hale and Dorr, LLP, Andrea J. Robinson, Hale & Dorr, LLP, Boston, MA, for Defendants.

### Memorandum and Order

KEETON, Senior District Judge.

### I. Pending Matters

Pending for decision in this Memorandum and Order are matters related to the following filings:

(1) Plaintiff's Motion To Disqualify Counsel and Request for an Expedited Hearing (Docket No. 12, filed July 31, 2003), with Memorandum in Support of Plaintiff's Motion To Disqualify Counsel (Docket No. 13, filed July 31, 2003);

(2) Defendants' Memorandum in Opposition to Motion To Disqualify Hale and Dorr LLP (Docket No. 24, filed August 14, 2003), with Affidavit of Robert E. Fast, Esq. (Docket No. 25, filed August 14, 2003), and Affidavit of Jonathan Chiel, Esq. (Docket No. 45, filed August 14, 2003);

(3) Plaintiff's Reply Memorandum in Support of Motion To Disqualify Counsel (Docket No. 27, filed August 22, 2003);

(4) Defendants' Motion To Dismiss Plaintiff's First Amended Verified Derivative Complaint (Docket No. 14, entered August 13, 2003), with Defendants' Memorandum in Support of Their Motion To Dismiss the Plaintiff's First Amended Ver-

ified Derivative Complaint (Docket Nos. 15–17, entered August 13, 2003), and Appendix of Unreported Cases Cited in Defendants' Memorandum in Support of Motion To Dismiss Plaintiff's First Amended Verified Derivative Complaint (filed with Docket Nos. 14 and 15–17), and Affidavit of Andrea J. Robinson, Esq., in Support of Defendants' Motion To Dismiss Plaintiff's First Amended Verified Derivative Complaint (Docket No. 19, entered August 13, 2003);

(5) Plaintiff's Memorandum in Opposition to Defendants' Memorandum in Support of Their Motion To Dismiss the Plaintiff's First Amended Verified Derivative Complaint (Docket No. 33, filed October 3, 2003), with Affidavit of David L. Kelston in Support of Plaintiff's Opposition to Defendants' Motion To Dismiss (Docket No. 32, filed September 22, 2003);

(6) Defendants' Reply Memorandum in Further Support of Their Motion To Dismiss the First Amended Verified Derivative Complaint (Docket No. 35, filed October 14, 2003), with Affidavit of Aravind Swaminathan, Esq., in Further Support of Defendants' Motion To Dismiss the Verified Derivative Complaint (Docket No. 36, filed October 14, 2003), and Appendix of Unreported Cases Cited in Defendants' Reply Memorandum in Further Support of Their Motion To Dismiss the First Amended Verified Derivative Complaint (Docket No. 37, filed October 14, 2003);

(7) Plaintiff's Surreply Memorandum in Further Support of Plaintiff's Opposition to Defendants' Motion To Dismiss the Plaintiff's First Amended Verified Derivative Complaint (Docket No. 38, filed October 29, 2003), with Affidavit of Noah Rosmarin in Support of Plaintiff's Surreply Memorandum in Further Support of Plaintiff's Opposition to Defendants' Motion To Dismiss the First Amended Verified De-

rivative Complaint (Docket No. 39, filed October 29, 2003);

(8) Affidavit of Jason B. Adkins, Esquire (Docket No. 41, filed December 23, 2003); and

(9) First Amended Verified Derivative Complaint (Docket No. 8, filed July 16, 2003).

## II. Relevant Background

### A. Introduction

This is a shareholder derivative action on behalf of John Hancock Financial Services, Inc. ("Hancock") against Hancock's board of directors ("the board" or "the directors") and senior executives.

Plaintiff's complaint states that "this is a[n] ... action brought ... for the payment and receipt of excessive compensation in violation of the law." (First Am. V. Derivative Compl., Docket No. 8, ¶ 1.) On closer examination, the complaint reveals a much broader scope: plaintiff challenges (1) numerous compensation decisions by the board (as excessive *and for other reasons*), (2) various acquisitions of stock by individual directors who allegedly had knowledge of material inside information, and (3) the sufficiency of disclosure in Hancock's 2003 proxy statement.

### B. Facts

A brief version of the facts as alleged in plaintiff's complaint follows. On January 27, 2000, nominal defendant Hancock issued an initial public offering ("IPO") as part of its demutualization (its conversion from a mutual to a stock company).

At a time before the IPO, in contemplation thereof, Hancock developed a Reorganization Plan ("Plan") in compliance with Massachusetts law. The Plan contained provisions (1) restricting compensation made to executives and directors for aiding, promoting, or assisting in the conver-

sion, and (2) barring the issuance of stock options or grants to executives or directors during the year following the IPO.

Also before the IPO, Hancock's investment banker estimated the market value of Hancock at about twice its book value. Plaintiff often refers to this estimation as "the undisclosed valuation."

At the IPO in January 2000, Hancock stock opened at $17. By the end of 2000, the stock had risen to $38 per share, "reflect[ing] its market value." (First Am. V. Derivative Compl., Docket No. 8, ¶ 24.) Since that time, however, Hancock's performance has "soured." (Id.) For virtually all of 2002, Hancock stock traded at a price well below $38. It ended 2002 at $27.90.

In its 2003 proxy statement, Hancock announced that it had awarded David D'Alessandro (Chairman, President, and CEO) $21.7 million in compensation for 2002. It also announced that it awarded Thomas Moloney (Senior Executive Vice President and CFO) $7.8 million, and Michael A. Bell (Senior Executive Vice President for Retail) $6.3 million. Several securities firms expressed concerns regarding these numbers.

Hancock compensated Stephen Brown, who retired as CEO in May 2000 and as Chairman in May 2001, $6.7 million in 2002 and $8.1 million in 2001. In 1999, he had received $2.8 million. In 2000, he had received $3.1 million.

The 2003 proxy statement does not disclose that the executive compensation was

> based in significant part on the combination of the rise in stock price during the one-year post-IPO period or to mention the fact that management was barred from benefiting [sic] from it. It fails to disclose that executive compensation was based on aiding, promoting or assisting the conversion, and that this is a prohibited basis for compensation.

(First Am. V. Derivative Compl., Docket No. 8, ¶ 35.) At various times in May 2003, however, D'Alessandro, Moloney, and Richard F. Syron (chair of the compensation committee of the Hancock board) appeared to indicate that executive compensation was based on the value created at, and value sustained following, the IPO. The 2001 proxy statement admits that Brown and D'Alessandro were compensated at some time on the basis of value created at the IPO.

On May 12, 2003, the board awarded all non-employee directors compensation totaling more than $100,000, including base pay of $50,000 and a grant of Hancock stock valued at $50,000. Per-meeting fees were also raised from $1,500 to $2,000.

In May 2003, a Deutsche Bank report noted a series of transactions that occurred between the years 2000 and 2002 by the board and D'Alessandro. Deutsche Bank reported that D'Alessandro purchased $1,000,000 of Hancock stock in early 2000, after the IPO, using a loan issued to him at some time by the board. Deutsche Bank also reported that D'Alessandro repaid the loan during 2002 with restricted stock. Plaintiff alleges that this restricted stock was also granted to D'Alessandro by the board.

Recently, news media have reported that Hancock's management may be seeking to sell the company in the near future.

## C. Relevant Procedural Background

On May 28, 2003, plaintiff filed the complaint for this suit in this court. On July 16, 2003, plaintiff filed an amended complaint (Docket No. 8).

On July 31, 2003, plaintiff filed a motion to disqualify defense counsel Hale & Dorr (Docket No. 12). Defendants opposed plaintiff's motion.

On August 8, 2003, defendants filed a motion to dismiss (Docket No. 14), as well as a motion to stay discovery pending decision on the motion to dismiss (Docket No. 20). Both motions were opposed.

At a hearing on December 18, 2003, this court granted defendants' motion to stay discovery. This court then set a hearing for January 21, 2004 to receive oral argument regarding defendants' motion to dismiss. This court took no action with respect to plaintiff's motion to disqualify.

At the hearing on January 21, 2004, this court declined to hear oral argument regarding plaintiff's motion to disqualify and then placed it on the "back burner." (Tr. of Jan. 21, 2004, Docket No. 44, at 7.) The court received oral argument regarding defendants' motion to dismiss.

### III. Plaintiff's Motion To Disqualify

In the Joint Statement Pursuant to Local Rule 16.1 (Docket No. 42) submitted by the parties at the hearing on December 18, 2003, plaintiff presented two options regarding his motion to disqualify. Plaintiff expressed a willingness to withdraw his motion to disqualify "so defendants' Motion To Dismiss can be heard and decided as soon as practicable." (Joint Statement, Docket No. 42, at 2.) Withdrawal, however, was offered with the condition that plaintiff be allowed to re-file the motion to disqualify at a later time. As an alternative to withdrawal, plaintiff "agree[d] to proceed[ ] with his Motion To Disqualify in the event this Court is willing to hear argument on and decide th[e] Motion contemporaneously with defendants' Motion to Dismiss." (*Id.* at 2–3.)

At the hearing, this court considered plaintiff's alternate proposals, but took no action. I noted that defendants refused the condition for withdrawal, and that plaintiff might wish to pursue his alternative proposal. I *did not*, however, accept plaintiff's alternative to hear the motion to

disqualify contemporaneously with defendants' motion to dismiss. Similarly, I did not refuse plaintiff's conditional withdrawal. I expressly made no ruling, leaving the matter open for further consideration. (Tr. of Dec. 18, 2003, Docket No. 43, at 20.)

At the hearing on January 21, 2004, plaintiff raised the motion again. Apparently because defendants had opposed conditional withdrawal, plaintiff pursued his alternative and sought to argue his motion to disqualify contemporaneously with defendants' motion to dismiss. Defendants, however, opposed plaintiff's attempt to proceed in this manner. In fact, notwithstanding their position in the Joint Statement, defendants appeared to prefer conditional withdrawal. (Tr. of Jan. 21, 2004, Docket No. 44, at 6 (arguing that plaintiff had "back-burnered the motion to disqualify" and "waived" it "for the time being").)

After some oral argument, I concluded that conditional withdrawal was the more appropriate of plaintiff's two proposals. Accordingly, I placed the motion "on the back burner." (*Id.* at 7.)

I now see no just reason not to dismiss plaintiff's motion to disqualify without prejudice to refiling. Several considerations militate in favor of dismissal. Plaintiff has made no indication that he will revisit the issue soon. Moreover, plaintiff likely will have somewhat different arguments if he chooses to press his motion at a later time; at a minimum, plaintiff will need to revise his motion to take into account the rulings made in this Memorandum.

In addition, by advocating conditional withdrawal at the hearing, defendants seem to have withdrawn the objections they initially made in the Joint Statement to withdrawal without prejudice. But in any event, those objections are unpersuasive. Defendants expressed concern that

refiling by plaintiff at a later time would result in prejudice to defendants. Defendants, however, may simply make that argument in the opposition they file if and when plaintiff re-files his motion to disqualify. Defendants also expressed concern that they would lose their right to seek sanctions. This court's dismissal of plaintiff's motion without prejudice in no way affects defendants' right to seek sanctions for the time and expense they committed to opposing the motion.

For these reasons, the Order below dismisses Plaintiff's Motion To Disqualify Counsel and Request for an Expedited Hearing (Docket No. 12).

### IV. Contentions Regarding the Motion To Dismiss

Defendants move to dismiss with prejudice all counts in plaintiff's complaint. All counts other than Count V proceed on multiple, independent claims. For example, under Count I, which is "Breach of Fiduciary Duty," plaintiff alleges breaches of fiduciary duty on the basis of (1) defendants' awarding of certain executive compensation, (2) defendants' awarding of certain director compensation, (3) defendants' purchasing or obtaining of stock while in possession of material inside information, and (4) defendants' issuance of a materially false and deceptive proxy statement. Counts II–IV (Breach of Loyalty, Unjust Enrichment, and Waste of Corporate Assets) are similar. Count V, entitled "Equitable Relief," states no claims. Count V is not a "count" in the usual sense of the term. Thus, plaintiff's complaint alleges *four counts* of wrongdoing.

In sum, the claims in plaintiff's four counts claim relief on the basis of a specified few separate actions by defendants. The claims allege and challenge (1) various compensation decisions by the board, (2) individual directors' acquisition of stock while in possession of material inside infor-

mation, and (3) the board's issuance of a materially false and deceptive proxy statement.

Defendants first move to dismiss under Fed.R.Civ.P. 23.1. Rule 23.1 requires plaintiff either to plead with particularity that demand was made on the corporation with respect to the challenged actions or to plead with particularity that demand would have been futile with respect to the challenged actions. Failure to comply with Rule 23.1 for a challenged action results in dismissal of all claims that rely on that challenged action. Defendants contend that plaintiff failed to satisfy Rule 23.1 for any and *all* of the challenged actions.

Defendants also move to dismiss under Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6), a claim is dismissed "when the allegations [in the complaint] are such that 'the plaintiff can prove no set of facts to support [the] claim.'" *Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 30 (1st Cir.2000).

As this is defendants' motion, I proceed in the order presented by defendants. I turn first to dismissal under Rule 23.1. I then consider under Rule 12(b)(6) any claims that survive Rule 23.1.

### V. Pleading Demand Futility with Sufficient Particularity Under Rule 23.1

### A. Introduction and Legal Standard

#### 1. Introduction

Under Fed.R.Civ.P. 23.1, the complaint in a shareholder derivative action must

> allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority ... and the reasons for his failure to obtain the action or for not making the effort.

*Id.*

Plaintiff states the following in his complaint:

Demand was not made on the directors because, inter alia, it would be futile since the directors lack independence and each benefitted personally from the wrongful conduct and cannot be expected to bring suit against him or herself. (First Am. V. Derivative Compl., Docket No. 8, ¶ 1.) Plaintiff also includes a section in the complaint that he entitles "Demand Futility." (*Id.* ¶¶ 36–37.) In light of the foregoing, plaintiff appears to have chosen to allege "the reasons ... for not making the effort." Fed.R.Civ.P. 23.1.

Defendants contend that plaintiff's attempt to comply with Rule 23.1 falls short. Specifically, defendants assert that plaintiff fails to plead (1) with particularity (2) an acceptable reason for why demand would have been futile. According to defendants, plaintiff's suit therefore must be dismissed in its entirety.

■ Defendants correctly point out that compliance with Rule 23.1 requires more than pleading with particularity *any* reason for why demand on a corporation would have been futile. The law of the state of incorporation provides the circumstances under which demand would be futile. *See Gonzalez Turul v. Rogatol Distribs., Inc.*, 951 F.2d 1, 2 (1st Cir.1991) (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)); *see also, e.g., In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 989–90 (9th Cir.1999).

## 2. Substantive Delaware Law Applied Under Rule 23.1

Delaware appears to be the state of incorporation for defendant corporation Hancock. In the complaint, plaintiff alleged Massachusetts as the state of incorporation. Defendants, in their motion to dismiss, contend that Delaware is the state of incorporation. Ordinarily, I accept the well-pleaded allegations of plaintiff's complaint as true when considering a motion to dismiss, and I do not look outside the four corners of the complaint. In *appropriate circumstances*, however, some exceptions apply to this ordinary course. *See Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir.1993). For example, I may look to documents of public record.

Circumstances here militate strongly in favor of looking outside the complaint. A true and accurate determination of the state of incorporation is vital to a threshold choice of law. Moreover, plaintiff appears to have acquiesced to defendants' contention. In his oppositions to defendants' motion to dismiss, plaintiff does not contest defendants' contention that Delaware is the state of incorporation and, in fact, solely argues Delaware law.

Hancock's Certificate of Incorporation reveals that Delaware is its state of incorporation. (Certificate of Incorporation, Exh. I to Docket No. 19.) Thus, I conclude that Delaware is the state of incorporation for Hancock.

Hancock appears to have been a Massachusetts Mutual Life Insurance Company before converting to a Delaware Corporation. This fact likely explains plaintiff's glaring error.

■ Under Delaware law, *Aronson v. Lewis*, 473 A.2d 805 (Del.1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000), remains the seminal precedent on the circumstances for demand futility when a shareholder challenges a decision *by the board of the corporation as a whole*. *Aronson* and its progeny provide that demand futility is established if, accepting the well-pleaded facts of the complaint as true, the alleged particularized facts raise a reasonable doubt that either (1) the directors are disinterested or independent with respect to the challenged transaction or (2) the chal-

lenged transaction was the product of a valid exercise of the directors' business judgment. *See, e.g., id.* at 812; *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984), *overruled on other grounds by Brehm,* 746 A.2d 244.

Accordingly, one question raised by defendants' motion to dismiss under Rule 23.1 is whether, for each challenged decision by the board as a whole, plaintiff's complaint pleads with particularity facts that meet either prong of the *Aronson* test.

*Aronson,* however, applies only to challenged transactions that were made by the board as a whole. *See, e.g., Rales v. Blasband,* 634 A.2d 927, 933–34 (Del.1993) ("[A] court should not apply the *Aronson* test for demand futility .... where the subject of the derivative suit is not a business decision of the board."). For transactions made by individual directors or subsets of the board, Delaware law turns to the *Rales* test. *See id.; Rattner v. Bidzos,* 2003 WL 22284323 (Del.Ch. 2003) ("[B]ecause [the shareholder] does not challenge any particular action undertaken by the Board as a whole, the standard established in *Rales v. Blasband* governs the determination of demand futility."). *But see Guttman v. Huang,* 823 A.2d 492, 501 (Del.Ch.2003) (suggesting that the *Rales* test is not so different from the *Aronson* test in that it "makes germane all of the concerns relevant to both the first and second prongs of *Aronson*"). Under *Rales,*

> a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this

burden, then demand will be excused as futile.

*Id.* at 934.

Accordingly, a second question raised by defendants' motion to dismiss under Rule 23.1 is whether, for challenged transactions not made by the board as a whole, plaintiff's complaint pleads with particularity facts that meet the *Rales* test.

Both of these tests (*Aronson* and *Rales*) rely on a "reasonable doubt" standard. It is important to note that the Delaware Supreme Court has

> conclude[d] that it would be neither practicable nor wise to attempt to formulate a criterion of general application for determining reasonable doubt.... Reasonable doubt must be decided by the trial court on a case-by-case basis employing an objective analysis.

*Grobow v. Perot,* 539 A.2d 180, 186 (Del. 1988), *overruled on other grounds by Brehm,* 746 A.2d 244. *Aronson,* which "introduced the term 'reasonable doubt' into corporate derivative jurisprudence," *Grimes v. Donald,* 673 A.2d 1207, 1217 (Del.1996), *overruled on other grounds by Brehm,* 746 A.2d 244, made expressly clear that "the entire review is factual in nature." *Aronson,* 473 A.2d at 815.

### 3. Other Rule 23.1 Considerations

I note at this time several other important principles that guide consideration of a Rule 23.1 motion to dismiss. First, even though "[c]ourts have tended to vary in the rigor with which they enforce Rule 23.1[,] in this circuit the Rule has been vigorously enforced." *Heit v. Baird,* 567 F.2d 1157, 1160 (1st Cir.1977). The First Circuit has reiterated this position in another opinion:

> This circuit vigorously enforces [the Rule 23.1] requirement and will dismiss derivative actions when plaintiffs do not comply.... In doing so, we have recognized the important policy behind the

demand requirement.... When shareholders undertake [a derivative] action it implies that the corporation is unwilling or unable to conduct a suit on its own behalf. Clearly, it should first be ascertained whether the corporation is unwilling to undertake the action.

*Gonzalez Turul,* 951 F.2d at 2 (citations omitted).

Similarly, the Supreme Court of Delaware has said that substantive Delaware law (such as *Aronson* and *Rales*) applied under the Delaware equivalent to Fed. R.Civ.P. 23.1 sets a high bar for demand futility. In a recent case, the court stated twice that the requirement of *particularized pleadings* is a strict threshold, notwithstanding the potential underlying merits. The court began the case with the following:

This is potentially a very troubling case on the merits....

But our concerns about lavish executive compensation and our institutional aspirations that boards of directors of Delaware corporations live up to the highest standards of good corporate practices do not translate into a holding that these plaintiffs have set forth particularized facts excusing a pre-suit demand under our law and our pleading requirements.

*Brehm,* 746 A.2d at 249. The court then concluded the case with this similar language:

One can understand why [the] stockholders would be upset with such an extraordinarily lucrative compensation agreement and termination payout awarded a company president who served for only a little over a year and who underperformed to the extent alleged. That said, *there is a very large— though not insurmountable—burden on stockholders who believe they should pursue the remedy of a derivative suit* instead of selling their stock or seeking to reform or oust these directors from office.

Delaware has pleading rules and an extensive judicial gloss on those rules that must be met in order for a stockholder to pursue the derivative remedy. Sound policy supports these rules, as we have noted. This Complaint, which is a blunderbuss of a mostly conclusory pleading, does not meet that burden, and it was properly dismissed.

*Id.* at 267 (emphasis added). Shareholders have "tools at hand" with which to satisfy these pleading requirements. *See Grimes,* 673 A.2d at 1216 (citing *Rales,* 634 A.2d at 934–35 n. 10 (describing the "tools")).

The Court of Appeals for the First Circuit has not articulated the level of specificity required for "particularity" under Rule 23.1. In the context of securities litigation, however, it has provided some standards about particularity in pleading fraud under Rule 9(b) that are, at a minimum, informative in this context.

Allegations based on 'information and belief' ... do not satisfy the particularity requirement unless the complaint sets for the facts on which the belief is founded. Furthermore, th[e] requirement of pleading supporting facts applies 'even when the fraud relates to matters peculiarly within the knowledge of the opposing party.'

*New Eng. Data Servs. Inc. v. Becher,* 829 F.2d 286, 288 (1st Cir.1987). These standards are, of course, not necessarily applicable here.

■ A second important principle is that I must look solely at the sufficiency of the allegations in the complaint, if at all possible. In the ordinary course, a court deciding a motion to dismiss looks only to the allegations of the complaint and accepts no documents or evidence not attached to the complaint or expressly incor-

porated therein. *See* Fed.R.Civ.P. 12(b)(6). Rule 23.1, however, requires more particularity in the complaint than an "ordinary" Rule 12(b)(6) motion to dismiss. *See, e.g., Heit,* 567 F.2d at 1160 ("[Rule 23.1] represents a deliberate departure from the relaxed policy of 'notice' pleading promoted elsewhere in the Federal Rules. The requirement places an initial burden on the stockholder ...." (citation omitted)). Accordingly, it is *even more important* here, in evaluating a motion to dismiss under Rule 23.1, to consider the complaint in isolation. *Cf. id.* at 1159 n. 3 ("In as much as a motion pursuant to Rule 23.1 challenges the sufficiency of a complaint, it would seem that neither side can supplement the record either to support or oppose the adequacy of the allegations."). Thus, exceptions that might apply *in the ordinary course* to strict consideration of the allegations in the complaint (such as those noted by both parties, *see Watterson v. Page,* 987 F.2d 1) here should be viewed skeptically and used sparingly, if at all.

Finally, I take all well-pled allegations as true and make all reasonable inferences in favor of plaintiff. *See Rales,* 634 A.2d at 931; *Brehm,* 746 A.2d at 255; *cf. Watterson,* 987 F.2d at 3 (taking all well-pleaded allegations as true and making all reasonable inferences in favor of plaintiff when considering a 12(b)(6) motion to dismiss, which is less stringent than a Rule 23.1 motion to dismiss). These obligations do not mean, however, that I accept as true mere conclusions, as opposed to well-pled allegations, *see Washington Legal Found. v. Mass. Bar Found.,* 993 F.2d 962, 971 (1st Cir.1993), or that I make *all* inferences, including unreasonable inferences, in favor of plaintiff.

## B. Preliminary Consideration of Plaintiff's Contentions

Plaintiff offers in his complaint and filings in opposition various explanations for demand futility. Most of these contentions address (1) whether the board is appropriately disinterested or independent to consider demand or (2) whether a particular board decision was an exercise of business judgment. (*See, e.g.,* First Am. V. Derivative Compl., Docket No. 8, ¶ 36.) As explained above in Section A, under *Aronson* a plaintiff need not make a demand on a board to challenge a board decision, if the complaint pleads with particularity facts that create reasonable doubt as to either of these issues. Also, as explained above, under *Rales* a plaintiff need not make a demand on a board to challenge transactions not made by the board as a whole, if the complaint pleads with particularity facts that create reasonable doubt as to the first of these issues. Thus, if supported in the complaint by sufficient allegations of particular facts, the contentions by plaintiff that address these issues would offer valid bases for this court to excuse demand as futile under Rule 23.1.

Accordingly, in the next few sections I examine the allegations of fact in the complaint to determine whether the contentions by plaintiff that address these issues establish demand futility.

Plaintiff, however, also offers explanations for demand futility that do not address either of these two issues—(1) the interest or independence of the board or (2) the board's exercise of business judgment. Such contentions, by contrast, do not provide valid bases under Delaware law for excusing demand as futile, even if supported in the complaint by sufficient allegations of particular fact. As a result, I simply reject these contentions now.

█ Plaintiff contends demand is futile on the following basis:

[D]espite being on notice about the problems alleged herein, among other

things, on the basis of public criticism on Wall Street and in the local and national media, the individual defendants have taken no remedial action to rectify the problem.

(*Id.*) Even if supported by allegations of particular fact, this assertion fails under Delaware law. It makes neither charges of board interest or dependence, or charges of failure to exercise business judgment in the underlying transactions. Plaintiff also contends that demand is futile because "the directors ... cannot be expected to bring suit against him or herself." (*Id.* ¶ 1.) This assertion is so hollow that it warrants no further consideration. It is well-settled that this exceedingly general assertion fails under Delaware law. *See, e.g., Kohls v. Duthie,* 791 A.2d 772, 779 (Del.Ch.2000) ("[T]he mere fact that directors would be asked to sue themselves is not a basis for excusing demand.").

I turn back now to plaintiff's potentially valid contentions of demand futility. I consider first, under the *Aronson* test, whether to excuse as futile demand with respect to decisions by the board as a whole. I then consider, under the *Rales* test, whether to excuse as futile demand with respect to transactions by individual directors.

## C. Decisions and Transactions by the Board as a Whole

### 1. Introduction

The allegations in plaintiff's four counts claim relief because of numerous decisions by the board as whole. One set of decisions may be described as decisions by the board to award compensation to corporate executives and to directors. From the factual allegations in the complaint, I gather the following: (1) compensation awarded to executives D'Alessandro, Bell, and Moloney in 2002, (2) cash and stock compensation for directors that was approved on May 12, 2003, (3) compensation awarded to former executive Brown in 2000, 2001, and 2002, (4) "secret stock options" granted to D'Alessandro (First Am. V. Derivative Compl., Docket No. 8, ¶ 30), and (5) unspecified loans or stock awarded to unspecified executives or directors (*Id.*). The claims also seek relief on the basis of the board's issuance of an allegedly false and deceptive proxy statement in 2003.

Plaintiff contends that making a demand on the board to challenge these decisions would have been futile.

As explained earlier, *Aronson* remains the seminal precedent under Delaware law on whether a court should excuse, as futile, the requirement of making a demand on the board to challenge decisions made by a board as a whole. In particular, to establish demand futility a plaintiff must, in his complaint, plead with particularity facts that raise a reasonable doubt that either (a) the directors are disinterested or independent with respect to the challenged transaction or (b) the challenged transaction was the product of a valid exercise of the directors' business judgment.

I consider plaintiff's contentions of demand futility first with respect to the challenged compensation of corporate executives. This category of compensation includes the transactions numbered above as (1), (3), and (4). I then consider the contentions with respect to the challenged compensation of the directors. This category of compensation includes the transaction numbered above as (2). I consider last plaintiff's contentions of demand futility with respect to the board's issuance of the 2003 proxy statement.

██ I do not evaluate demand futility with respect to the compensation decisions that I numbered above as (5) (the unspecified loans or stock awarded to unspecified executives or directors). Rather, I dismiss

summarily under Rule 23.1 any claims that seek relief on the basis of these unspecified board actions. I do so because an unspecified action by the board as a whole necessarily fails the *Aronson* test. If the transaction itself is not alleged with particularity, it simply is impossible to show with particularity reasonable doubt that either (1) the directors are disinterested or independent *with respect to the challenged transaction* or (2) the *challenged transaction* was the product of a valid exercise of the directors' business judgment. The Order below accordingly allows in part defendants' motion to dismiss.

## 2. Compensation of Executives

### a. Is the Board Interested?

■ The court in *Aronson* specifically gave the following standard for determining whether a board is interested:

> From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.

473 A.2d at 812. The court further clarified that a *majority* of the board must be interested to excuse demand as futile. *Id.* at 815 & n. 8.

■ The allegations in the complaint fail to show with particularity that the board is interested with respect to compensation given to executives. Plaintiff's complaint does not allege that anyone other than the compensated executives gain any benefit from the compensation to executives. The alleged facts also provide me no basis to infer otherwise. Moreover, according to the complaint, the executives comprise only a minority of the board. Thus, a

majority of the board cannot have stood on both sides of the transaction.

Nevertheless, plaintiff contends in his opposition filings that the directors are interested. Plaintiff appears to offer three bases for this position: (1) the directors acquired stock while in possession of undisclosed information, (2) the directors acquired stock in 2002 in violation of the corporation's Reorganization Plan, and (3) the directors awarded stock to the non-employee directors. (I use the word "appears" here to note the lack of clarity that pervades plaintiff's filings. Although plaintiff divides his filings and memoranda into parts and sections with requisite headings, the arguments within each division consistently lack coherence and organization.)

All of these contentions fail for lack of relevance. Under *Aronson,* any disqualifying director interest must be interest that relates to the challenged transaction. *Rales,* 634 A.2d at 933; *Pogostin,* 480 A.2d at 624. None of these alleged bases for interest has any relevance to compensation awarded to executives.

Plaintiff's first contention also fails because it relies on allegations of fact that do not appear in the complaint. As I explained earlier, "Rule 23.1 challenges the sufficiency of a complaint." *Heit,* 567 F.2d at 1159 n. 3. In particular, plaintiff's opposition filings refer to a 2001 Non–Employee Director Long–Term Stock Incentive Plan that appears nowhere in the complaint. (*See* Pl.'s Opp., Docket No. 33, at 17.) In addition, plaintiff refers to individual director stock ownership and acquisitions in the year 2000 (*id.* at 19 & n. 33; Pl.'s Surreply, Docket No. 38, at 11 n. 11), but plaintiff's complaint is devoid of any allegations of specific transactions or specific amounts by specific directors.

Plaintiff's second contention fails for additional reasons, as well. First, plaintiff

relies on the allegation that "Hancock's directors awarded themselves significant stock grants in 2002." (Pl.'s Opp., Docket No. 33, at 20 (emphasis altered).) Nowhere in the *complaint,* however, does plaintiff make this allegation. The only allegation of director self-compensation of stock is that of May *2003.* (First Am. V. Derivative Compl., Docket No. 8, ¶ 29.) Second, plaintiff relies on a proposition that is inappropriate. Plaintiff's contention is that the directors are interested because they awarded themselves stock in violation of section 9.2(b) of the Reorganization Plan. Plaintiff, however, does not allege a violation of the letter of section 9.2(b). Rather, plaintiff rests this contention on a violation of the spirit or purpose of 9.2(b). As I explain more fully in Part V.C.2.c.ii, the proposition that I should look to the spirit or purpose of 9.2(b) is inappropriate given the clear and unambiguous language in 9.2(b).

I conclude that the directors are sufficiently disinterested to invoke a requirement of a demand with respect to the challenged executive compensation.

### b. Is the Board Dependent?

Under *Aronson,* "[t]he question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction." *Pogostin,* 480 A.2d at 624. In other words, is the board "incapable, due to … domination or control, of objectively evaluating a demand, if made, that the Board assert the corporation's claims that are raised by plaintiffs"? *Brehm,* 746 A.2d at 257. A *majority* of the board must be dependent to excuse demand as futile. *Aronson,* 473 A.2d at 815 & n. 8.

Plaintiff contends that "the board lacks independence from Hancock's CEO who apparently controls the board on compensation." (First Am. V. Derivative Compl., Docket No. 8, ¶ 36.) Plaintiff pleads only one particular fact in support of this mere conclusion. *Cf. Aronson,* 473 A.2d at 816 ("The shorthand shibboleth of 'dominated and controlled directors' is insufficient."). Plaintiff alleges one executive, Mr. Bell, claimed that his compensation was " 'entirely at the discretion of Mr. D'Alessandro.' " (*Id.*)

In my view, plaintiff's allegation fails to establish reasonable doubt as to the independence of a majority of the board with respect to executive compensation (generally or of Bell specifically). The court in *Aronson* "conclude[d] that in the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' " 473 A.2d at 816. Plaintiff's sole allegation of fact hardly rises to such a level. Taken as true, plaintiff's allegation establishes only that Bell made a statement about his compensation being at the discretion of D'Alessandro, the CEO. It does *not* establish that Bell's compensation was in fact at the discretion of D'Alessandro. And because the statement comes devoid of *any* context, it would be unreasonable for me to draw any inferences from it, especially in light of the severely heightened pleading standard under which I am making my current evaluations. I have no more reason to infer that Bell intended the statement as fact than I do to infer that he intended it as speculation, or that he meant it literally rather than figuratively, or about his compensation generally rather than one specific instance.

Accordingly, I conclude that the directors are sufficiently independent to in-

voke the requirement of a demand with respect to the challenged executive compensation.

### c. Were the Transactions Exercises of Business Judgment?

#### i. Introduction

The court in *Aronson* explained this second prong of the test for demand futility in the following way:

> [I]n determining demand futility the [court] in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that ... the challenged transaction was otherwise the product of a valid exercise of business judgment.

*Id.* at 814. The court makes an inquiry "into the substantive nature of the challenged transaction and the board's approval thereof." *Id.* I note that under Delaware law this is a "heavy burden." *White v. Panic,* 783 A.2d 543, 551 (Del.2001) (internal quotation marks omitted).

Plaintiff contends that the various executive compensation decisions were not exercises of business judgment by the board. Specifically, plaintiff argues that the compensation violated the Reorganization Plan, that the compensation violated the *Massachusetts* law underlying the Reorganization Plan, and that the compensation was wasteful. According to plaintiff, these contentions, if true, demonstrate that the challenged executive compensation decisions could not have been exercises of business judgment.

#### ii. Violations of the Reorganization Plan and the Law

Plaintiff contends that the facts alleged in the complaint demonstrate that the challenged executive compensation violated the Reorganization Plan and the Massachusetts law upon which the Plan was based. Plaintiff further contends that approval of compensation that violates a contract or the law cannot be an exercise of business judgment. In plaintiff's words, "the business judgment rule does not and cannot insulate unlawful conduct." (First Am. V. Derivative Compl., Docket No. 8, ¶ 36.)

Plaintiff's argument relies, however, on a false premise. The business judgment rule *can* insulate unlawful conduct. As the Delaware Supreme Court explained in *Aronson,*

> The business judgment rule is ... a presumption that in making a business decision the directors of a corporation acted on an informed basis, *in good faith and in the honest belief* that the action taken was in the best interests of the company.

473 A.2d at 812 (emphasis added). One can reasonably conceive of numerous situations in which directors might act on an informed basis, in good faith and in the honest belief that an action taken is in the best interests of the company and yet approve a transaction that, in the end, proves to be unlawful. As a Delaware chancery court has explained,

> The business outcome of an investment project that is unaffected by director self-interest or bad faith, cannot itself be an occasion for director liability. That is the hard core of the business judgment doctrine.

*Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del.Ch.1996) (emphasis altered). The court further explained:

> By "bad faith" is meant a transaction that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive. *There can be no personal liability of a director for losses arising from "illegal" transactions if a director were finan-*

*cially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction.*

*Id.* at 1051 n. 2 (citation omitted) (emphasis altered). It is also informative that the Delaware law that allows a certificate of incorporation to include a provision limiting or eliminating personal liability of the directors *explicitly excludes* "acts or omissions not in good faith or which involve intentional misconduct or a *knowing* violation of the law." Del.Code Ann. tit. 8, § 102(b)(7) (emphasis added).

Plaintiff's attempts to refute these basic principles of the business judgment rule and to distinguish *Gagliardi* are wholly unpersuasive. Plaintiff first contends that a requirement of knowledge or bad faith is contrary to the "objective" *Aronson* standard of "reasonable doubt." (Pl.'s Surreply, Docket No. 38, at 8.) But the *Aronson* standard of reasonable doubt is not meant to alter or affect the definition of business judgment. The question in *Aronson* is whether the facts create an objective, reasonable doubt that the board *exercised* business judgment. Plaintiff's argument is simply inapposite.

Plaintiff also attempts to distinguish *Gagliardi*, which I cite above, by asserting that *Gagliardi* does not conduct an *Aronson* analysis. This contention appears to be based in the same misunderstanding as that driving plaintiff's first contention. *Aronson* does not, and should not be interpreted to, alter or affect the definition of business judgment. A case that conducts an *Aronson* analysis defines the business judgment rule no differently than a case that does not conduct an *Aronson* analysis. I take from *Gagliardi* the definition of business judgment, which may be applied to this case.

Accordingly, what plaintiff offers—factual allegations that demonstrate that the transactions violated the law—is insufficient, in the ordinary course, to create reasonable doubt that the board failed to exercise business judgment in approving the transactions. Plaintiff must allege facts that create reasonable doubt that the board acted *without knowledge* that the transactions violated the law, or reasonable doubt that the board acted with reliance on reasonably selected counsel. Plaintiff makes no allegations of fact in his complaint that creates a reasonable doubt as to either of these issues. Plaintiff's only allegation of knowledge comes in the form of a mere conclusion: "Hancock's directors knowingly violated the one-year prohibition in Hancock's Plan of Reorganization and the perpetual ban on compensation for aiding, promoting or assisting the conversion." (First Am. V. Derivative Compl., Docket No. 8, ¶ 36.)

One can imagine, however, a violation so clear, so apparent, or so egregious on its face that the very violation does create a reasonable doubt that the board acted without knowledge. This appears to be the situation in *Sanders v. Wang*, No. 16640, 1999 WL 1044880 (Del.Ch. Nov.8, 1999). The Delaware chancery court found a reasonable doubt of the exercise of business judgment when the alleged facts showed a board violated an "express [plan] provision limiting the number of shares they were authorized to award." *Id.* at *5. The court made no mention of whether the board *knew* the transaction would violate the plan, or whether the plaintiff alleged a *knowing* violation. But the court was careful to explain that "the provision [limiting the number of shares] is *not ambiguous* and [that] it is clear from the uncontroverted facts that the number of shares the board actually awarded exceeded its limitation of six million shares." *Id.* (emphasis added). It concluded that the violation was so clear that the board could not

contend good faith or honest belief within the meaning of the business judgment rule. "The ... board can not justify its clear violation of the express terms of the [plan]." *Id.* at *6.

 Such a clear violation does not exist here, however. Taking the alleged facts as true, I find no violation so clear that the violation alone creates a reasonable doubt that the board acted without good faith or honest belief. In fact, for the reasons below, I conclude that plaintiff fails even to allege with particularity facts that demonstrate a violation of the Reorganization Plan and, accordingly, the corresponding Massachusetts laws.

Plaintiff makes the following two contentions:

The board's actions in compensating executives on the basis of the precise period of time they were barred from benefiting [sic] from the conversion violated the letter and spirit of the prohibition on personal gain in both the Plan and governing statutes (including, *e.g.*, G.L. c. 175, § 19E(9)). The board's actions also violate the perpetual ban on compensating director and executive officers with any valuable consideration whatsoever for aiding, promoting or assisting the conversion as per the Plan and § 19E(9).

(First Am. V. Derivative Compl., Docket No. 8, ¶ 25.)

To evaluate the complaint's factual support for these contentions, I must first look outside the complaint for the language of the Plan. I explained at the beginning of this Part that I must limit myself as far as possible to the four corners of the complaint. Due to the heightened pleading requirements, even exceptions ordinarily allowed in considering a 12(b)(6) motion to dismiss are to be viewed skeptically here in the consideration of a Rule 23.1 motion to dismiss. Nevertheless, I look outside the complaint for the following reasons.

The language of the allegedly violated Plan is *central* to evaluating plaintiff's contentions. Yet, plaintiff does not include that language in his complaint or even refer to the exact Plan provisions or sections. *Cf. Watterson,* 987 F.2d at 4 ("[C]ourts have made narrow exceptions [in the case of 12(b)(6) motions to dismiss] for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."). Moreover, it turns out upon examination that the allegations in plaintiff's complaint somewhat mischaracterize one relevant provision of the Plan.

I first consider the alleged violations of what plaintiff calls "the prohibition on personal gain in ... the Plan" (First Am. V. Derivative Compl., Docket No. 8, ¶ 25), which is section 9.2(b) of the Reorganization Plan. Section 9.2(b) of the Plan reads as follows:

Until one year after the completion of the IPO, neither the Holding Company nor the Company shall award any stock options or stock grants to any executive Officer or Director.

(Plan of Reorganization, Exh. C to Docket No. 19, at 60.)

Plaintiff makes *no* factual allegations in his complaint that any of the executive compensation involved the awarding of stock options or stock grants during the year after the completion of the IPO. Plaintiff contends, however, that his factual allegations nevertheless demonstrate in two ways a violation of section 9.2(b).

Plaintiff first asserts the following:

The logical intent of the provision was to bar management from profiting on the stock's designed appreciation for the year after the IPO when its price would rise up to its market value. Necessarily, the provision must also bar the award or

receipt of stock-based equity for the stock's performance during the one-year period. To interpret the prohibition otherwise would render it meaningless. Thus, even if stock grants are awarded *after* the one-year period, if they are based retroactively on the stock's performance *within* the prohibited year, they are unlawful.

(Pl.'s Opp., Docket No. 33, at 13 (citation omitted).) Plaintiff contends that the Long Term Stock Incentive Plan (LTSIP) "further illustrates how [this] reading is correct." (*Id.* at 14; Pl.'s Surreply, Docket No. 38, at 4–5.) According to plaintiff, the complaint alleges with particularity facts that support a violation of 9.2(b) on this reading. Specifically, plaintiff asserts that some of the challenged executive compensation included shares of stock awarded on the basis of Hancock's stock performance during the prohibited year.

This "intent"-based argument, however, is inappropriate. The language of the provision is clear and unambiguous. I should not look past the plain and ordinary meaning. *See Mass. Broken Stone Co. v. Weston*, 430 Mass. 637, 723 N.E.2d 7, 9 (2000) ("Where the language of a statute is clear, courts must give effect to its plain and ordinary meaning and the courts need not look beyond the words of the statute itself."); *see also Sanders*, 1999 WL 1044880, at *6 ("Contract interpretation starts with the terms of the contract. If the terms are pain in their face, then the analysis stops there.") (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997)).

Plaintiff's second contention is that the board violated 9.2(b) by awarding "secret stock options" to D'Alessandro and others. (First Am. V. Derivative Compl., Docket No. 8, ¶ 30.) The argument involves four transactions. CEO D'Alessandro and other executives received loans from the board some time before the end of the restricted year after the IPO. The recipients of the loans purchased Hancock stock during the restricted year. After the year, the recipients of the loans received stock from the board. The stock was then used to repay the loans.

I note first that plaintiff pleads in his complaint particular facts only with respect to D'Alessandro. Accordingly, I consider only the possibility that D'Alessandro received "secret" or constructive stock options. I do not consider plaintiff's mere speculation that other executives received loans and undertook the same sort of transactions.

As to defendant D'Alessandro, plaintiff's contention fails for the same reason that plaintiff's "intent"-based argument failed. The plain language of 9.2(b) is clear and unambiguous. Accordingly, I cannot look beyond the ordinary and plain meaning of the words. Section 9.2(b) bars only the award of stock options or stock grants to any executive officer or director during the restricted year. It neither bars the award of loans nor the purchase of stock by any executive officer or director. Taken as true, the alleged facts regarding these "secret stock options" simply do not establish a violation of 9.2(b).

I turn now to consider the alleged violations of what plaintiff describes as "the perpetual ban on compensating directors and executive officers with any valuable consideration whatsoever for aiding, promoting or assisting the conversion as per the Plan," which is section 9.3 of the Plan. (*Id.*) Section 9.3 states:

> No director, officer, agent or employee of the Company shall receive any fee, commission or other valuable consideration whatsoever, other than their usual salary and compensation, for in any manner aiding, promoting or assisting in

connection with the transactions contemplated by the Plan of Reorganization. (Plan of Reorganization, Exh. C to Docket No. 19, at 60.)

Plaintiff's complaint contains sufficient factual allegations to establish that some of the challenged executive compensation was based on value *created at or by the IPO*. Such compensation seems to fall under the 9.3 rubric of compensation or fees "for in any manner aiding, promoting or assisting in connection with the transactions contemplated by the Plan of Reorganization."

■ In his complaint, however, plaintiff fails to plead with particularity facts that establish, or that allow me to infer, that this compensation was not "usual salary and compensation," as allowed under 9.3. In fact, plaintiff chose in his complaint to ignore entirely the fact that section 9.3 allowed for usual compensation, leaving the clause out of *his* characterization of 9.3: "a perpetual ban on compensating directors and executive officers with *any valuable consideration whatsoever* for aiding, promoting or assisting the conversion." (First Am. V. Derivative Compl., Docket No. 8, ¶ 30.) On the facts alleged, I might have a reasonable basis for inferring that the compensation seems high, but that differs significantly from inferring that the compensation was not "usual."

As I stated earlier, I conclude for the foregoing reasons that plaintiff fails to allege with particularity facts that demonstrate a violation of the Reorganization Plan and, accordingly, the corresponding Massachusetts laws.

To summarize, plaintiff contends that the facts alleged demonstrate with particularity that the challenged executive compensation violated the Reorganization Plan and the corresponding Massachusetts law. Only a *knowing* violation of the law renders a decision outside the business judgment rule, however. Thus, in the ordinary course, what plaintiff offers is insufficient to create reasonable doubt that the board failed to exercise business judgment in approving the compensation.

One can imagine, however, a violation so clear that the very violation creates reasonable doubt that the board acted without knowledge. But such a violation does not exist here. In fact, after reviewing the allegations in the complaint, I conclude that, contrary to his assertions, plaintiff fails even to allege violations of the Reorganization Plan and, accordingly, the corresponding Massachusetts laws.

### iii. Waste

Plaintiff contends that the challenged executive compensation was so excessive as to constitute waste. If supported by particularized allegations of fact, plaintiff's contention would create reasonable doubt that the board exercised business judgment in approving the transactions. *Cf. Grimes*, 673 A.2d at 1215 ("[A] judgment normally will receive the protection of the business judgment rule unless the facts show that such amounts, compared with the services to be received in exchange, constitute waste . . . .").

Specifically, plaintiff grounds his contention in the assertion that the challenged compensation violated the Plan. Relying on *Sanders v. Wang*, plaintiff contends that unauthorized transactions are per se waste. *See* 1999 WL 1044880, at *4–5 (finding demand futility where defendant directors awarded stock options to executives in amounts exceeding that authorized by the corporate stock plan).

The proposition plaintiff cites from *Sanders*, however, is not related at all to waste. Nowhere in the discussion cited by plaintiff does the court in *Sanders* mention waste. In fact, I explained above in the previous section the meaning of this partic-

ular proposition from *Sanders.* It is part of a body of case law that holds that a knowing violation of the law is not an exercise of business judgment. As I explained, *Sanders* represents a peculiar subset of that case law where the violation of a contract is so clear that the violation alone creates reasonable doubt that the board acted in good faith and honest belief. In short, this case does not articulate the standard for corporate waste.

Indeed, the Delaware Supreme Court *has* defined corporate waste, and not in the terms asserted by plaintiff:

"The judicial standard for determination of corporate waste is well developed. Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.... If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky."

*Brehm,* 746 A.2d at 263 (quoting *Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del.Ch. 1997)).

Plaintiff contends that the challenged executive compensation is waste under the above definition, as well. Again, plaintiff grounds this contention in the assertion that the challenged compensation violated the Plan and, therefore, was unauthorized and unlawful. According to plaintiff, a corporation that issued unauthorized or unlawful compensation necessarily received "nothing whatsoever for what it gave." (Pl.'s Opp., Docket No. 33, at 23 (internal quotation marks omitted).)

As I concluded in the previous section, plaintiff has failed to plead with particu-larity facts that demonstrate the executive compensation violated the Plan or Massachusetts law. Even if the compensation was unauthorized or unlawful, however, plaintiff's contention fails. Plaintiff simply presents flawed logic. A corporation that issued unauthorized or unlawful compensation could very well have received consideration for that compensation. That compensation is unauthorized or unlawful reflects only that the recipient of the compensation is not entitled to the compensation, for one reason or another. It does not follow that the recipient gave *no* consideration whatsoever.

Delaware courts have been vigilant in explaining that an allegation of corporate waste is a difficult one to prove. One Delaware court has described corporate waste as "a very high burden, not easily met by would-be plaintiffs; any other rule would allow plaintiff shareholders to second guess the decisions of boards of directors, thereby creating disincentives for the optimal assumption of economic risk." *In re Nat'l Auto Credit, Inc. Shareholders Lit.,* No. Civ. A. 19028, 2003 WL 139768, *13 (Del.Ch.2003). In approving a lower court's conclusion that "a board's decision on executive compensation is entitled to great deference," the Delaware Supreme Court stated in a recent case that "the size and structure of executive compensation are inherently matters of judgment." *Brehm,* 746 A.2d at 263. Waste lies at the "outer limits, ... confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Id.* Courts must not become "super-directors, measuring matters of degree in business decisionmaking and executive compensation." *Id.* at 266.

The court even made an effort to emphasize the difference between liability under the law and good corporate governance practices:

This is a case about whether there should be personal liability of the directors of a Delaware corporation to the corporation for lack of due care in the decisionmaking process and for waste of corporate assets. This case is not about the failure of the directors to establish and carry out ideal corporate governance practices.

All good corporate governance practices include compliance with ·statutory law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. . . .

*Id.* at 255–56.

 Corporate compensation to executives plainly receives significant latitude under Delaware law. Yet at bést, the facts pled in plaintiff's complaint show that executive compensation was high. Plaintiff pled that some independent securities firms raised questions about the compensation and downgraded their investment recommendations of Hancock, but, as the Delaware Supreme Court has stated,

The inquiry here is not whether we would disdain the composition, behavior and decisions of [the board] as alleged in the Complaint if we were . . . stockholders. . . . [T]hat determination is not for the courts. That decision is for the stockholders to make in voting for directors, urging other stockholders to reform or oust the board, or in making individual buy-sell decisions involving [company] securities.

*Id.* at 256. Plaintiff asserted conclusions and insinuated that the board exceeded its authority, but offered no allegations of fact sufficient to support those assertions or to demonstrate that the board exceeded its authority knowingly or in bad faith. Indeed, as defendants note in their motion to dismiss, plaintiff failed to plead with particularity any facts regarding the board's process or lack of process in determining executive compensation. Without allegations regarding process, I can draw no reasonable inferences about the board's considerations in awarding compensation.

Accordingly, I conclude that plaintiff has failed in his complaint to plead with particularity facts that, if taken as true, demonstrate with particularity that the challenged executive compensation was corporate waste or even create reasonable doubt that the compensation was not corporate waste.

### iv. Conclusion

For the foregoing reasons, I conclude that plaintiff has not pled with particularity facts that create a reasonable doubt as to whether the board exercised business judgment in awarding any of the challenged executive compensation. Plaintiff has failed to satisfy the second prong of *Aronson* with respect to the challenged executive compensation.

### d. Conclusion

Because plaintiff has failed to plead with particularity facts that create a reasonable doubt as to either prong of the *Aronson* test, I conclude that demand was not futile with respect to any of the challenged executive compensation. As explained earlier, the "challenged executive compensation" includes all the executive compensation decisions that are named with any specificity in the complaint: (1) compensation awarded to executives D'Alessandro, Moloney, and Bell in 2002, (2) compensation awarded to former executive Brown in 2000, 2001, and 2002, and (3) "secret stock options" granted to D'Alessandro.

All claims under plaintiff's four counts that seek relief on the basis of the chal-

lenged executive compensation are to be dismissed for failure to comply with Rule 23.1. The Order below accordingly allows in part defendants' motion to dismiss.

### 3. Compensation to Directors

#### a. Is the Board Interested?

Plaintiff offers the same three arguments to show the directors are interested in directoral compensation that he offered to show the directors were interested in executive compensation. The first two arguments fail for the same reasons that I explained in Part V.C.2.a.

Plaintiff's third argument has merit, but is incomplete. The challenged directoral compensation (of May 12, 2003) includes awards of stock-based equity to all non-employee directors. Plaintiff makes the following contention: "Since the directors stand on both sides of the transaction—awarding and receiving the stock grants—they are clearly interested." (Pl.'s Opp., Docket No. 33, at 21.) In my view, this contention has merit. It also applies, however, to the remainder of the challenged compensation.

I am unclear as to why plaintiff failed to assert that the directors stand on both sides of the *entire* May 2003 compensation to non-employee directors. Nevertheless, I conclude for the following reasons that plaintiff has pled with particularity facts that create reasonable doubt as to the disinterestedness of the directors regarding the challenged directoral compensation.

The court in *Aronson* articulated the basic principle of board interest:

> From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves

upon the corporation or all stockholders generally.

473 A.2d at 812.

Plaintiff challenges here compensation that the directors awarded to the non-employee directors. The complaint alleges the following:

> On May 12, 2003, Hancock's directors awarded all non-employee directors compensation of over $100,000 each, including a base pay of $50,000 (more for committee chairpersons), and a *grant* of $50,000 worth of Hancock stock (nearly 1,800 shares) for each director. (Fees were also upped from $1,500 to $2,000 per meeting). This reflected a 150% increase from non-employee directors' guaranteed compensation last year (which was a base of $40,000 last year and 1,500 stock *options* rather than grants).

(First Am. V. Derivative Compl., Docket No. 8, ¶ 29.) The complaint further alleges that the non-employee directors comprise well over a majority of the board. Plaintiff clearly has pled with particularity director interest as articulated in *Aronson.* A majority of the directors stand on both sides of the challenged transaction and expect to derive personal financial benefit from the transaction in the sense of self-dealing.

Defendants contend that any disqualifying interest arising from directors' fees must be material. (Def.'s Memo. in Support of Mot. To Dismiss, Docket Nos. 15–17, at 30.) According to defendants, plaintiff failed to plead that the fees are material.

But defendants misunderstand the law. The cases defendants cite involve plaintiffs that challenge a transaction unrelated to directors' fees, but assert that the mere receipt of fees by the directors creates inappropriate interest in the transaction.

*See In re Nat'l Auto Credit, Inc.,* 2003 WL 139768. In those situations, the mere allegation that directors' fees exist does not create interest. The shareholders must also allege that the fees are material.

■ When the challenged transaction involves self-dealing, however, the shareholders need not allege materiality of the fees. In one of the cases that defendants cite for the principle that materiality is necessary, the court states this exact exception.

> It should be noted, however, that *in the absence of self-dealing,* it is not enough to establish the interest of director by alleging that he received any benefit not equally shared by the stockholders. Such benefit must be alleged to be material to that director.

*Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch. 2002) (emphasis altered).

The situation here, where directors have voted to compensate themselves, is one of self-dealing. Allegations of materiality are not necessary.

In fact, Delaware courts have stated explicitly that a director is interested when the challenged transaction involves self-compensation. The Delaware Supreme Court recently concluded the following:

> Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection . . . .

*Telxon Corp. v. Meyerson,* 802 A.2d 257, 265 (Del.2002). A Delaware chancery court found demand futility when a plaintiff challenged certain directors' self-compensation:

> As the outside directors comprise a majority of the . . . board and are personally interested in their compensation levels, demand upon them to challenge or decrease their own compensation is excused.

*Steiner v. Meyerson,* Civ. A. No. 13139, 1995 WL 441999, *11 (Del.Ch. July 19, 1995).

■ Thus, I conclude that plaintiff has pled with particularity facts that create reasonable doubt that the board is sufficiently disinterested in its May 12, 2003 compensation decision to consider demand. Demand with respect to that particular compensation decision is excused as futile. With respect to Rule 23.1, all claims under plaintiff's four counts that claim relief on the basis of this challenged director compensation may proceed. These claims must now be evaluated under defendants' motion to dismiss under Rule 12(b)(6).

#### b. Is the Board Independent?

In light of my conclusion that the board is interested in the directoral compensation, I need not consider whether the board is sufficiently independent to consider demand. *Aronson,* 473 A.2d at 815 ("Certainly, if this is an 'interested' director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases.").

#### c. Were the Transactions Exercises of Business Judgment?

Similarly, in light of my conclusion above, I need not consider whether the board exercised business judgment in approving the May 12, 2003 compensation to non-employee directors. *Id.*

#### 4. The Board's Issuance of the 2003 Proxy Statement

Plaintiff offers absolutely nothing in his complaint or his filings to account for his failure to make a demand on the board to challenge the board's decisions in issuing the 2003 proxy statement. An *Aronson* analysis would be wasted effort.

I conclude that plaintiff fails to comply with Rule 23.1 regarding this challenged action. All claims under plaintiff's four counts that seek relief on the basis of the board's issuing the 2003 proxy statement are to be dismissed for failure to comply with Rule 23.1. The Order below accordingly allows in part defendants' motion to dismiss.

## D. Decisions and Transactions Not Made by the Board as a Whole

In this case, plaintiff also challenges decisions not made by the board as a whole. As explained earlier, I employ a standard other than *Aronson* when determining whether plaintiff should have made demand on the board before bringing a derivative suit with respect to these types of decisions or transactions. Under *Rales,*

a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

634 A.2d at 934.

■ Plaintiff does not acknowledge the existence of this separate and distinct *Rales* test, even though defendants raise the matter in their filings. As a result, plaintiff's filings do not address the *Rales* test in any organized fashion. The relevant arguments are there, because the *Rales* test is essentially the first prong of *Aronson,* which plaintiff does address. I have no obligation to act to remedy plaintiff's ignorance of (or disregard for) the law. Notwithstanding, I read past plaintiff's organization in the interest of making a just decision on the merits.

Plaintiff challenges numerous alleged stock transactions by individual directors that occurred while these directors and the board had knowledge of material inside information. In the complaint, plaintiff offers the following:

To the extent any executive officer or director purchased or received stock after the IPO, they further obtained unfair advantage, as well as took a corporate opportunity, given that Hancock's investment banker's market valuation of Hancock was known to them, but was not disclosed in its Plan or other information disseminated to policyholders or shareholders.

(First Am. V. Derivative Compl., Docket No. 8, ¶ 32.) Plaintiff appears to have in his opposition filings two explanations for why demand would have been futile with respect to these transactions. Both contentions turn on allegations of board interest.

■ Plaintiff first contends that the board's interest arises from the fact that most or all of the directors engaged in the challenged individual transactions. But plaintiff's complaint is almost entirely devoid of any allegations that specific directors acquired or sold specific stocks at specific times while in possession of material inside information. The only such allegation relates to a purchase of stock during 2000 by D'Alessandro. One purchase by one director, however, does not create inappropriate interest on the part of the entire board.

Plaintiff tries to overcome his deficient pleading in several ways. First, plaintiff makes specific allegations in his opposition filings. (Pl.'s Opp., Docket No. 33, at 19 n. 33; Pl.'s Surreply, Docket No. 38, at 11 n. 11.) As I have explained, however, "Rule 23.1 challenges the sufficiency of a complaint." *Heit,* 567 F.2d at 1159 n. 3. Sec-

ond, plaintiff asserts in two *footnotes* that specific allegations are not required. (Pl.'s Opp., Docket No. 33, at 16 n. 17; Pl.'s Surreply, Docket No. 38, at 14–15 n. 15.) These footnotes, however, are unpersuasive.

The first footnote argues that "specific records are unnecessary for a determination on whether there was a *blanket* ban on the stock acquisitions." (Pl.'s Opp., Docket No. 33, at 16 n. 17.) This argument is valid as far as it goes, but plaintiff nevertheless must plead specific violations of any blanket ban. The existence of a blanket ban does not alone establish that any director violated the ban. The second footnote contends that specific transactions need not be pled because plaintiff in fact challenges a "particular action taken by *the board as a whole.*" (Pl.'s Surreply, Docket No. 38, at 14–15 n. 15 (internal quotation marks omitted and emphasis added).) Plaintiff asserts in this footnote that he challenges decisions by the board as a whole to adopt "director and executive stock incentive plans." (*Id.* at 15 n. 15.) The flaw with this argument, however, is that neither of these alleged stock incentive plans appears *anywhere* in the complaint.

Plaintiff next contends that the board's interest arises from failure, as a board, to prevent the challenged individual transactions. Plaintiff provides little further explanation, stating only that the failure to prevent is "a . . . basis for breach of duty of loyalty, and therefore lack of disinterestedness." (Pl.'s Opp., Docket No. 33, at 19.)

I understand plaintiff's contention as a two-part argument. First, *in failing to prevent the transactions, the board breached certain duties.* Under Delaware law, this first step may be called a *Caremark* claim. *In re Caremark Int'l Derivative Litig.,* 698 A.2d 959 (Del.Ch.1996).

*Caremark* "articulates a standard for liability for failures of oversight." *Guttman,* 823 A.2d at 506. Second, this breach creates liability, which makes the directors interested.

As a starting matter, this contention faces the same problems as plaintiff's first contention regarding board interest: plaintiff fails almost entirely to provide any allegations of specific transactions allowed by the board. As plaintiff himself concedes, the only transaction that is alleged with any specificity is the one by D'Alessandro in 2000. (Pl.'s Opp., Docket No. 33, at 19 n. 25.)

With respect to D'Alessandro, plaintiff does not make allegations sufficient even to meet the first prong of his contention, the *Caremark* standard. *Caremark*

> requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith. Put otherwise, the decision premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs.

*Guttman,* 823 A.2d at 506 (footnote omitted). A *Caremark* claims is "a difficult one to prove." *Id.* at 505–06.

The complaint offers no allegation that the directors knew that allowing D'Alessandro to purchase stock in March 2000 would be a failure in oversight. Plaintiff's contention is that the failure results from allowing D'Alessandro to purchase stock while in possession of the undisclosed valuation, which plaintiff asserts was material inside information. The complaint, however, makes no allegation that the directors knew the alleged "undisclosed valuation" was in fact inside knowledge at the time that D'Alessandro purchased his stock. In my view, the reasonable inference from the alleged facts is that the board assumed the information became stale, as is the usual

course, once the IPO occurred in January 2000 before D'Alessandro purchased his stock.

Even if plaintiff had pled a knowing failure, however, he would not meet the *Caremark* standard. The court in *Caremark* stated the following:

> Only a sustained or systemic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability. Such a test of liability—lack of good faith as evidenced by sustained or systemic failure of a director to exercise reasonable oversight—is quite high.

*Caremark,* 698 A.2d at 971. A *single failure* to prevent D'Alessandro from obtaining stock while he possessed material inside information thus hardly rises to *Caremark* liability.

Plaintiff has failed to create a reasonable doubt that the directors were interested in the challenged individual transactions. Thus, plaintiff has not met the *Rales* test.

All claims under plaintiff's four counts that claim relief on the basis of the challenged individual transactions are to be dismissed. The Order below accordingly allows in part defendants' motion to dismiss.

### E. Conclusion

After reviewing plaintiff's complaint under *Aronson* and *Rales,* I have concluded that plaintiff has failed in significant part to comply with Rule 23.1. Demand has been excused as futile only for the director compensation of May 12, 2003. Plaintiff has failed to plead with particularity facts to establish demand futility for any of the other challenged transactions. Thus, all claims, except those that claim relief on the basis of the director compensation of

May 12, 2003, are to be dismissed under Rule 23.1.

The dismissal of these claims is without prejudice. Plaintiff may either exercise demand or re-plead demand futility with sufficient particularity. Defendants move to dismiss with prejudice under Rule 23.1, but they provide, and I am aware of, no case law in this circuit that supports their proposition. On the contrary, First Circuit dismissals under Rule 23.1 have been without prejudice. *See, e.g., Gonzalez-Turul,* 951 F.2d 1.

### VI. Failure To State a Claim Under Rule 12(b)(6)

Defendants also move to dismiss under Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6), a claim is dismissed "when the allegations [in the complaint] are such that 'the plaintiff can prove no set of facts to support [the] claim.'" *Clorox Co. Puerto Rico,* 228 F.3d at 30. This is a difficult standard to meet. "Because of the liberal pleading standards of Fed.R.Civ.P. 8, the motion to dismiss [under Rule 12(b)(6) ] is viewed with disfavor." *Upjohn Co. v. Mova Pharmaceutical Corp.,* 899 F.Supp. 46, 47 (D.P.R.1995). It is also important to note that under federal case law

> the complaint ... need not state with precision all elements that give rise to a legal basis for recovery as long as fair notice of the nature of the action is provided.... [T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery on *any legal theory,* even though it may not be the theory suggested or intended by the pleader, or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.

5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 120–22 (1969) (footnotes omitted and em-

phasis added). I now consider under this standard the few claims that remain in the case at bar.

The claims that remain are claims alleging breach of fiduciary duty (under Count I), breach of loyalty (under Count II), unjust enrichment (under Count III), and waste of corporate assets (under Count IV) as a result of the board's awarding director compensation on May 12, 2003.

■■■■ The allegations of fact in plaintiff's complaint establish that the director compensation in question is self-interested. Self-interested transactions are subject to a fairness analysis under Delaware law that places the burden of proving reasonableness or fairness of the transaction on the interested party. *See Steiner*, 1995 WL 441999. Failure of this fairness analysis could provide grounds for a viable claim for breach of fiduciary duty, breach of loyalty, or unjust enrichment. I cannot now conclude that no set of facts exists that is consistent with the allegations in the complaint and that would demonstrate the transactions were unreasonable, unfair, or similarly improper. Thus, given the difficult 12(b)(6) standard for dismissal, I do not dismiss the claims for breach of fiduciary duty, breach of loyalty, and unjust enrichment that remain in the case at bar.

■■■■ The claims for waste of corporate assets also cannot be dismissed under Rule 12(b)(6). As explained earlier in this Memorandum (Part V.C.2.c.iii), the test for corporate waste is *very* high. I reproduce here the standard I cited earlier:

"Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.... If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment*

that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky."

*Brehm*, 746 A.2d at 263 (quoting *Lewis*, 699 A.2d at 336). The allegations in the complaint, if true, establish that the compensation was $100,000 plus per-meeting fees. I cannot now conclude that the plaintiff will be unable to prove facts that demonstrate the roughly $100,000 in directoral compensation is so disproportionately large in relation to the service provided by the directors that no reasonable person would be willing to make the trade.

For the foregoing reasons, I will not dismiss under Rule 12(b)(6) the claims that survived Rule 23.1. The Order below accordingly denies in part defendants' motion to dismiss.

## VII. No Entry of Final Judgment

Under Fed.R.Civ.P. 54(b), I may "direct the entry of final judgment as to one or more but fewer than all of [multiple] claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for entry of judgment." *Id.*

I make no such express determination or express direction at this time with respect to the claims by plaintiff that I will dismiss without prejudice under Rule 23.1. No party has represented to this court that an entry of final judgment is appropriate or that no just reason for delay exists.

The Order below directs the clerk not to enter any separate final judgment.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Plaintiff's Motion To Disqualify Counsel and Request for an Expedited Hearing (Docket No. 12) is DISMISSED WITHOUT PREJUDICE.

(2) Defendants' Motion To Dismiss Plaintiff's First Amended Verified Derivative Complaint (Docket No. 14) is ALLOWED IN PART and DENIED IN PART. All claims by plaintiff, except those that claim relief on the basis of the director compensation of May 12, 2003, are DISMISSED WITHOUT PREJUDICE. Separate Final Judgment is not to be entered.